**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-CR-60253-MOORE**

**UNITED STATES OF AMERICA**

**v.**

**LAWRENCE ALEXANDER,**

      **Defendant.**

                     /

**UNITED STATES' MOTION TO EXCLUDE DEFENDANT LAWRENCE ALEXANDER'S EXPERT TESTIMONY OR, IN THE ALTERNATIVE, MOTION TO COMPEL ADDITIONAL DISCLOSURES AND HOLD A _DAUBERT_ HEARING**

The United States of America, through undersigned counsel, files this Motion to Exclude Defendant Lawrence Alexander's Expert Testimony, or, in the Alternative, Motion to Compel Additional Disclosures and Hold a _Daubert_ Hearing.  On August 10, 2022, Alexander filed a Notice of Expert Disclosure, which identified James Orr as a polygraph expert and Bart Baggett as a handwriting expert.  [D.E. 99, "Expert Notice"].  Also on August 10, 2022, Alexander filed a Motion to Admit Polygraph Evidence.  [D.E. 100].  The Government moves to exclude the proposed experts and deny the Motion to Admit Polygraph.  Alternatively, the Government moves to compel additional disclosures specified herein and requests a _Daubert_ hearing to determine if one or both experts' opinions are admissible in this trial.

Both experts are insufficiently noticed, and, as the proponent of the evidence, Alexander has not established that their opinions are reliable.  To the contrary, as noticed, both proposed experts' opinions fail to meet the standards set forth in Federal Rule of Evidence 702 and _Daubert v. Merrill Dow Pharmaceuticals, Inc._, 509 U.S. 579 (1993).

The polygraph evidence is nothing more than an improper attempt to admit into evidence Alexander's own self-serving, hearsay statements under the guise of an expert. Not only is it black-letter law that a defendant cannot introduce his own hearsay statements at trial, but it is also axiomatic that an expert cannot be used to introduce evidence that is not admissible under the Rules of Evidence. Alexander's attempt to circumvent these basic rules and introduce his own statements, vouched for by a polygraph "expert," should be rejected out of hand. If Alexander wishes to introduce his own statements, he can testify. The jury will then judge Alexander's credibility under cross-examination and weigh the evidence in the case. The polygraph evidence would do nothing to assist the jury in this endeavor and will serve only to confuse and mislead the jury. Indeed, the polygrapher's questions about Alexander's state of mind during the relevant time period amounts to an improper opinion on an ultimate issue in the case, in violation of Rule 704(b). The polygraph evidence also flunks the tests set forth Rule 702 and *Daubert*. The polygraph evidence should therefore be excluded.

As to the handwriting expert, Mr. Baggett's report, which was previously disclosed to the Government but has not been filed with the Court, says nothing about how the handwriting samples for Mr. Baggett's analysis were selected.[1] In addition, the signature in question is what Mr. Baggett terms a "symbolic" signature with no distinct letters and minimal points to analyze. Handwriting expert testimony on such a non-distinct signature would only confuse the jury and, without more information as to the selection of known Alexander signatures and the methodology applied, Mr. Baggett's opinions and methodology are not reliable.

---

[1] The report was disclosed to the Government pursuant to Rule 410, as was a prior polygraph report. Because Alexander has now put these discloses at issue in the trial, the Government references this evidence in this filing, and, if the polygraph or handwriting evidence is admitted at trial, the Government intends to use this evidence in the course of the trial.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Indictment

Defendant Alexander was indicted on August 31, 2021, along with four other individuals, including Defendant Waxman, for his role in a DME fraud scheme that, over the course of five years, billed Medicare roughly $31.4 million, of which roughly $15.8 million was paid. [*See* D.E. No. 1]. The Indictment charges Alexander with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (Count 6), and false statements relating to health care matters, in violation of 18 U.S.C. § 1035 (Count 19).

In sum, the Indictment alleges that Waxman owned and operated several durable medical equipment ("DME") companies that paid kickbacks to obtain patient referrals for medically unnecessary orthotic braces, which the DME companies then fraudulently billed to Medicare. Waxman recruited nominee owners to own other DME companies on paper: Silent Hill Bracing and Orthopedic Supplies, LLC ("Silent Hill"); West Bay Medical Supply, Inc. ("West Bay"); and Active Assist DME, Inc. ("Active Assist")). Although Waxman was a part-owner and manager of all these DME companies, his interest in Silent Hill, West Bay, and Active Assist was concealed from Medicare. Alexander agreed to open Silent Hill in his relative's name, and he knowingly and willfully caused the submission of a CMS Form 855S enrollment document containing false statements. Alexander caused the enrollment document to certify that his relative was the sole owner and managing employee of Silent Hill when, in reality, Waxman and Alexander were the true owners and managers of Silent Hill. Once the DME companies were enrolled with Medicare, Waxman and others entered into kickback agreements with patient brokers whereby they paid kickbacks to patient brokers in exchange for the referral of patients, including signed doctors' orders, for various orthotic braces that could be billed to Medicare. The patients typically did not

3

need these products. Instead, Waxman and co-conspirators paid telemedicine companies to provide prescriptions for these braces, even though the telemedicine doctors were not treating the patients, did not examine the patients, and did not conduct follow-up visits with the patients.

### B. The Orr Polygraph

On August 10, 2022, Alexander filed his Expert Notice disclosing James Orr as a polygraph expert and summarizing in a single paragraph Orr's expected testimony that "he administered a polygraph examination to Dr. Alexander, that he asked Dr. Alexander whether he was aware of any illegal activity at Silent Hill, and that based upon his expertise Dr. Alexander responded truthfully to the questions Mr. Orr asked." [D.E. 99, at 1]. Alexander simultaneously filed the Motion to Admit Polygraph Evidence, which attached as Exhibit C an affidavit from Mr. Orr regarding the examination of Alexander conducted on July 7, 2022. Alexander also disclosed Orr's CV. The Government does not dispute that Mr. Orr is qualified to perform a polygraph.

Orr's affidavit states that he used the Utah Zone Event Specific (single Issue) Directed Lie Comparison Question Test ("CQT"). The affidavit describes the circumstances of the polygraph exam and notes that it was audio and video recorded. Orr's affidavit does not discuss any of his opinions regarding the results of the test.

On August 15, 2022, the Government requested that Alexander disclose the following: "the results of any other polygraph administered to Dr. Alexander, all communications between Alexander or his counsel (current or former) and any polygrapher (including drafts of questions and draft reports, as well as any other communication, whether over email, letter, or text), any documents or materials provided to the polygrapher or relied upon by the polygrapher in drafting the report, any audio or video recording of any polygraph, the retention agreement for the polygrapher and the amounts paid to date." Alexander has not produced these materials.

Also on August 15, 2022, Alexander filed additional materials in support of his Motion, including an "Objective Scoring System – Version 3" report which describes three questions that Orr asked Alexander:  (1) Before you learned of the FBI investigation, did you know Silent Hill was being used for illegal activity?  Answer – NO; (2) Before learning of the FBI investigation, did you know Silent Hill was being used for illegal activity?  Answer – NO; (3) Before you learned of the FBI investigation, did you know Jeremy Waxman was using Silent Hill for illegal activity? Answer – NO.  This report indicates a result of "no significant reactions" in response to these questions.

### C.  The Baggett Report

On March 21, 2022, Alexander's prior counsel disclosed a report by Mr. Baggett analyzing samples of Alexander's handwriting.  Mr. Baggett indicated that he was directed to offer an opinion "regarding the authenticity of the signatures of Lawrence Alexander on a Sales Marketing Agreement dated January 1, 2017, and an Administrative Services Agreement dated January 1, 2017."  Mr. Baggett identified 16 handwriting samples from Alexander that he used to conduct his analysis of the following signature:

Company Name: Silent Hill Bracing and Orthopedic Supplies
Representative Name: Lawrence Alexander
Representative Title: President
Date: 1/01/2017
Signature:

Mr. Baggett's affidavit notes that this is a "simplified symbolic" signature, which "presents certain challenges for identification purposes" because it is a "non-complex signature, and many experts believe that such signatures are easier to attempt to simulate because of the lack of turns, loops, spacing, and complex formations common in longhand signatures with 8-20 different

5

letters." Mr. Baggett also indicated that the scan or copy of the signature at issue is "low-medium resolution" which means "some features of the ink are not viewable when magnified. The resulting image is a pixelated line, rather than an ink trail with observable qualities. This is a limiting factor in fully resolving this case with absolute certainty." Despite all of this, Mr. Baggett was somehow able to conclude that Alexander did not write the questioned signatures, with a level of certainty of "probable."

## LEGAL STANDARD

### A. Rule 16's Expert Disclosure Requirements

Here, the Government requested reciprocal expert disclosures in its First Response to the Standing Discovery Order. [D.E. 38]. Alexander's counsel has requested expert disclosures from the Government. Once the Government provided expert disclosure, Federal Rule of Criminal Procedure 16(b)(1)(C)(i) obligated Defendant to timely provide the Government with a description of its expert "witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Rule 16's expert disclosure provisions are "intended to meet [the need for counsel to learn that an expert is expected to testify] by first, requiring notice of the expert's qualifications which in turn will permit the requesting party to determine whether the witness is an expert within the definition of Federal Rule of Evidence 702." Fed. R. Crim. P. 16 Advisory Committee's Note (1993). Next, the "requesting party is entitled to a summary of the expected testimony." *Id.* And finally, "and perhaps most important, the requesting party is to be provided with a summary of the bases of the expert's opinion." *Id.* This includes "'not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion ….'" *United States v. Cordoba*, 2012 WL 3614319, *2 (S.D. Fla. Aug. 21, 2012) (Rosenbaum, J.) (quoting *United States v. Holland*, 223 F. App'x 891, 894 (11th Cir. 2007); Fed.

6

R. Crim. P. 16(a)(1)(G), Fed. R. Crim. P. 16 Advisory Comm. Notes, 1993 Amendment). As such, Rule 16 disclosure is intended to "minimize the results from unexpected expert testimony … and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16 Advisory Committee's Note (1993); *see also United States v. Petrie*, 302 F.3d 1280, 1288-89 (11th Cir. 2002) (affirming the district court's preclusion of defendant's expert witness testimony because "a year and a half had passed between the return of the superseding indictment," and the defendant filed his notice of expert witness testimony on the eve of trial); *Holland*, 223 F. App'x at 894 (government's expert disclosure deficient where disclosure provided only "terse" summary of subject to expert testimony, but "failed to provide any additional information as to the bases and reasons for [expert]'s conclusions"); *Cordoba*, 2012 WL 3614319, at *3 (government's expert disclosure did not satisfy Rule 16 because it only discussed some, but not all, of expert's opinions and did not identify "the bases and reasons for [the expert]'s opinions").

### B. *Daubert* Governs the Admission of Scientific Testimony.

The Supreme Court held in *Daubert* that scientific testimony is only admissible if (1) it constitutes scientific knowledge, and (2) it would assist the trier of fact to understand the evidence or determine a fact in issue. *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In determining whether a technique constitutes scientific knowledge, the Supreme Court set forth five factors that courts should consider. Those factors include: (1) whether the technique can be and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained general acceptance within the relevant scientific community. *Id.* at 593-94. In determining whether a proffered scientific

expert's opinion is admissible under Rule 702 and *Daubert*, the Eleventh Circuit has held that "the burden clearly rests with the proponent of that expert" to establish the reliability of the evidence. *McClaim v. Metabolife International, Inc.*, 401 F.3d 1233, 1238 n.2 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

## ARGUMENT

I.      **ALEXANDER'S POLYGRAPH EVIDENCE SHOULD BE EXCLUDED AS SELF-SERVING HEARSAY, INADMISSIBLE UNDER RULE 608 AND 704(b), UNRELIABLE UNDER RULE 702 AND *DAUBERT*, AND UNDULY PREJUDICIAL UNDER RULE 403.**

"Opinions based on polygraph examinations are seldom, if ever, admissible into evidence." *United States v. Pavlenko*, 845 F. Supp. 2d 1321, 1324 (S.D. Fla. 2012) (Scola, J.) (quoting *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1284 (11th Cir. 2010)). Before 1989, polygraph evidence was *per se* inadmissible in the Eleventh Circuit. In *United States v. Piccinonna (Picinonna I)*, 885 F.2d 1529 (11th Cir. 1989) (en banc), the Eleventh Circuit articulated two circumstances in which a court may, in its discretion, admit polygraph evidence: (1) "where both parties stipulate in advance as to the circumstances of the test and as to the scope of its admissibility"; or (2) where the evidence is offered to impeach or corroborate the testimony of a witness. *Piccinonna I*, 885 F.2d at 1536.[2]

As the parties have not stipulated to the admissibility of Alexander's polygraph, under *Piccinonna I*, this evidence can only be admitted to corroborate or impeach Alexander's testimony at trial. A court may admit such corroborating evidence only after the following three prerequisites

---

[2]      As to the first circumstance, "[t]he stipulation as to circumstances must indicate that the parties agree on material matters such as the manner in which the test is conducted, the nature of the questions asked, and the identity of the examiner administering the test." *Id.* Here, the United States was not advised in advance that the polygraph would be conducted and was not provided an opportunity to reach a stipulation on the manner of the test, the questions asked, or the examiner used. For the polygraph to be admissible by stipulation, all aspects of the stipulation must be agreed "in advance of the polygraph test." *Id.* The United States has not so stipulated.

are satisfied:  (1) "the party planning to use the evidence at trial must provide adequate notice to the opposing party that the expert testimony will be offered"; (2) the opposing part must be given a "reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions"; and (3) the polygraph examiner's testimony must be admissible under the Federal Rules of Evidence governing the admissibility of corroboration testimony.  *Id.*  Even if a party satisfies these prerequisites, a district court can exercise its discretion to exclude the polygraph evidence under other applicable rules of evidence.  *Id.* at 1536-37.

### A.  The Court Should Exclude Alexander's Polygraph Evidence Under Federal Rules Of Evidence 801, 802, 608, And 704(b).

It is well-settled that a defendant's self-serving, out-of-court statements are inadmissible hearsay.  *See United States v. Willis*, 795 F.2d 1486, 1501 (11th Cir. 1985) (upholding the exclusion of defendant's "allegedly exculpatory statements at the time of his arrest" because it is "precisely what is forbidden by the hearsay rule"); Fed. R. Evid. 801(d)(2) (permitting admissions of party-opponent); Fed. R. Evid. 802 (hearsay is inadmissible).  Here, the polygrapher's testimony is merely a way to launder Alexander's self-serving statements into evidence in blatant violation of Rule 802's prohibition on hearsay.

Even if Alexander testifies and his credibility is put at issue on cross-examination, which it likely would be, the statements made during the polygraph are still inadmissible.  "[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."  Fed. R. Evid. 608.  "[E]vidence that a witness passed a polygraph examination, used to corroborate that witnesses' in-court testimony, would not be admissible under Rule 608 unless or until the credibility of that witness were first attacked."  *Piccinonna I*, 885 F.2d at 1536.  Even then, "Rule 608(b) prohibits evidence of specific instances of the conduct of a witness for the purpose of attacking or supporting the witness'

character for truthfulness." *United States v. Arthur*, 2011 WL 3844090, *3 (S.D. Fla. Aug. 29, 2011). Admitting into evidence the answers to the three questions asked in the polygraph is in fact using specific instances (the questions and answers) to support Alexander's character for truthfulness—a prohibited method of bolstering credibility. *Id.* at *3.

Moreover, Alexander's proclamation of innocence in a meeting arranged by his attorney well after his arrest is irrelevant to Alexander's credibility as a witness. The polygrapher asked no questions about facts that will be contested at trial, such as whether Alexander directed his relative's signature to be placed on certain documents or whether Alexander himself signed certain documents. Instead, the polygrapher asked what amounts to the ultimate question in the case: subjective questions regarding Alexander's knowledge of "illegal activity." The polygraph expert's testimony "is to the effect that at the time the Defendant engaged in the acts [he] is charged with, [he] had no knowledge that it was illegal. Such testimony constitutes testimony with respect to the mental state or condition of a defendant in a criminal case. Fed. R. Evid. 704(b) not only prohibits such testimony, it clearly states the ultimate issue of a defendant's mental state is for the 'trier of fact alone.'" *Arthur*, 2011 WL 3844090, *3 (excluding polygraph based on Rule 704 where the defendant was accused of being a straw buyer in a mortgage fraud case and was asked during polygraph whether she had "any idea that there may be something illegal" with the mortgage paperwork) (quoting *United States v. Booth*, 309 F.3d 566, 573 (9th Cir. 2002)) (citing *United States v. DiDomenico*, 985 F.2d 1159, 1164-65 (2d Cir. 1993)).

Expert testimony as to a defendant's state of mind, such as that proposed by Alexander, is not admissible and "[s]uch ultimate issues are matters for the trier of fact alone." Fed. R. Evid. 704(b); *see also United States v. Alvarez*, 937 F.2d 1024, 1030 (11th Cir. 1988) ("Expert testimony expressly stating an opinion as to the defendant's state of mind at the time of the offense is barred

by rule 704(b)."); *United States v. Benavidez-Benavidez*, 217 F.3d 720, 724 (9th Cir. 2000) ("Rule 704(b) prohibits the admission of polygraph evidence offered for the purpose of proving the defendant's mental state."); *United States v. Warner*, 2014 WL 1373634, at *6-10 (N.D. Ga. April 18, 2014) (excluding under Rule 704(b) a polygraph that asked whether defendant had ever filed a tax return knowing he did not have authority to do so); *United States v. Monroe*, 2015 WL 7176417, at *4 (N.D. Ga. Nov. 12, 2015) (excluding under Rule 704(b) polygraph that asked whether defendant "was aware" that transactions at issue "involved the sale of illegal drugs").

**B. The Court Should Exclude Alexander's Polygraph Evidence Under Rule 702 And *Daubert*.**

The polygraph evidence is inadmissible for the independent reason that Alexander has failed to meet his burden under Federal Rule of Evidence 702 and *Daubert* to establish the reliability of the proposed polygraph evidence. *Metabolife International, Inc.*, 401 F.3d at 1238 n.2 (11th Cir. 2005); *see also United States v. Duque*, 176 F.R.D. 691, 693-95 (N.D. Ga. 1998) (holding that Defendant did not meet his burden to establish the reliability of polygraph evidence). "*Piccinonna [I]* was decided prior to the Supreme Court's decision in *Daubert*, where the *Frye* test still governed the admissibility of expert opinions. Since *Daubert*, several district courts in this Circuit have analyzed the admissibility of polygraph evidence under the now-governing standard and have excluded such evidence under Federal Rule of Evidence 702." *Pavlenko*, 845 F. Supp. 2d at 1324 (collecting cases); *see also United States v. Scheffer*, 523 U.S. 303 (1998); *Henderson*, 409 F.3d 1293. In *Henderson*, the Eleventh Circuit concluded that the district court reasonably determined that polygraph evidence did not meet the standards of *Daubert* and Rule 702. 409 F.3d at 1302. The magistrate judge in that case had conducted a *Daubert* hearing and concluded that polygraph theory was not subject to reliable testing; that the test's error rate was unacceptably high; that counter-measures can defeat the test; and that it did not enjoy general

11

acceptance in the scientific community. *Id.* at 1303.  In sum, polygraph evidence flunked four out of the five *Daubert* criteria. *Id.* at 1302-03.  The Eleventh Circuit upheld that determination, noting that the Supreme Court itself viewed polygraph evidence as controversial, citing *Scheffer* for the proposition that:

> The contentions of respondent and the dissent notwithstanding, there is simply no consensus that polygraph evidence is reliable.  To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques.  Some studies have concluded that polygraph tests overall are accurate and reliable.  Others have found that polygraph tests assess truthfulness significantly less accurately than scientific field studies suggest ….

*Id.* at 1303; *see also Pavlenko*, 845 F. Supp. 2d at 1325 (applying *Henderson* to conclude that polygraph evidence is not sufficiently reliable or scientific under Rule 702).

Much akin to the present case, in *Gilliard*, the Eleventh Circuit upheld the exclusion of polygraph evidence in a Medicare fraud case.  There, the defendant had submitted to a polygraph examination consisting of four questions pertaining to the allegations that the defendant was involved a scheme to defraud Medicare.  The defendant denied any wrongdoing in response to the polygraph and the trained polygrapher concluded that the defendant was not being deceptive.  The district court excluded the polygraph and the Eleventh Circuit affirmed, agreeing that the questions regarding the validity of the technique used by the polygrapher and its lack of acceptance within the relevant scientific community rendered the evidence inadmissible under Rule 702.  *United States v. Gilliard*, 133 F.3d 809, 814-15 (11th Cir. 1998).

In *Pavlenko*, Judge Scola agreed that polygraph evidence did not satisfy four of the five *Daubert* factors.   Judge Scola concluded that "polygraph theory and technique cannot be adequately tested, as there is no reliable measure of a polygraph's ability to detect deception accurately," "there is no basis to establish a reliable error rate for polygraph results," "maintenance and adherence to polygraph examination standards are self-imposed and cannot adequately

guarantee the validity of the polygraph result," "an examinee could still adopt deliberate countermeasures to defeat accurate readings," and the case law reveals "substantial disagreements over the effectiveness of polygraphs" and "there is no consensus within the scientific and legal community over the efficacy of polygraph evidence." 845 F. Supp. 2d at 1326-27 (quoting *United States v. Loaiza-Clavijo*, 2012 WL 529981, at *3-5 (N.D. Ga. Jan. 25, 2012), *report and recommendation adopted by* 2012 WL 529975 (N.D. Ga. Feb. 17, 2012)).[3]

Consistent with these decisions, Alexander's proposed polygraph evidence fails under *Daubert* and Rule 702 because it does not constitute scientific knowledge.

First, polygraph theory and technique "cannot be adequately tested." *United States v. Laurent*, --- F. Supp. 3d ---, 2022 WL 1467626, at *4 (S.D. Fla. May 10, 2022) (Seitz, J.) (quoting *Pavlenko*, 845 F. Supp. 2d at 1326). Because the polygraph is based on an interpretation of physiological data, "there is no reliable measure of a polygraph's ability to detect deception accurately." *Id.* (quoting *Pavlenko*, 845 F. Supp. 2d at 1326; *Loaiza-Clavijo*, 2012 WL 529981, at *3). "Among the various problems with the accuracy of polygraph examination results is the influence of underlying factors, other than truthfulness, that produce obscured responses. For

---

[3]    Numerous other courts have found that a polygraph test is not admissible. *United States v. Cordoba*, 194 F.3d 1053 (9th Cir. 1999) (upholding district court's finding that the relevant scientific community did not generally accept polygraph exams as being sufficiently reliable to be used as evidence at trial); *United States v. Beck*, 729 F.2d 1329, 1332 (11th Cir. 1984) (same); *United States v. Arthur*, No. 10-20753-CR, 2011 WL 3844090 (S.D. Fla. Aug. 29, 2011) (Seitz, J.) (granting government's motion *in limine* to exclude polygraph evidence); *United States v. Derosa*, No. 10-60194-CR, 2011 WL 742655 (S.D. Fla. Feb. 23, 2011) (Cohn, J.) (same); *United States v. Evans*, 469 F. Supp. 2d 1112 (M.D. Fla. 2006) (not admissible under *Daubert* and 702); *United States v. Duque*, 176 F.R.D. 691 (N.D. Ga. 1998) (finding that polygraph is not reliable under *Daubert*); *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (holding that polygraph results would not likely assist the trier of fact); *United States v. Morejon*, 2008 WL 11339963, at *2 (S.D. Fla. Oct. 20, 2008) (Hoeveler, J.) (not admissible under Rule 702); *United States v. Londono*, 2018 WL 706761 (S.D. Fla. Jan. 10, 2018) (Goodman, J.) *report and recommendation adopted by* 2018 WL 705313 (Graham, J.).

13

instance, 'it is unclear the extent to which the results of the examination reflect physiological detection as opposed to the influence of extraneous information and resulting examiner confirmation bias on the way the physiological data are collected and interpreted." *Laurent*, 2022 WL 1467626, at *4 (quoting William G. Iacono & G. Gershon, Ben-Shakhar, *Current Status of Forensic Lie Detection with the Comparison Question Technique:  An Update of the 2003 National Academy of Sciences Report on Polygraph Testing*, 43 Law and Human Behavior, No. 1, 86, 91 (2019)).

Second, "there is simply no consensus that polygraph evidence is reliable" and the "scientific community remains extremely polarized about the reliability of polygraph techniques." *Laurent*, at *5 (quoting *Scheffer*, 523 U.S. at 309); *see also Pavlenko*, 845 F. Supp. 2d at 1326 ("there is no basis to establish a reliable error rate for polygraph results"); *Loaiza-Clavijo*, 2012 WL 529981, at *4 (finding that "there is insufficient evidence to establish a reliable error rate or to know the true potential for error in polygraph examinations"); *United States v. Evans*, 469 F. Supp. 2d 1112, 1113 (M.D. Fla. 2006) ("[D]ue to their nature, the error rate ... for polygraph tests is unknown," and "the validity and reliability of polygraph results is uncertain."); *see also Henderson*, 409 F.3d at 1303; *Piccinonna II*, 729 F. Supp. 1336, 1338 (S.D. Fla. 1990).  Indeed, "[i]t is inconceivable that anyone, expert or not, could form a valid, reliable, and admissible opinion as to the 'character' of a witness based on nothing more than one single polygraph examination." *Piccinonna II*, 729 F. Supp. at 1338.

Third, even assuming the polygraph complied with the American Polygraph Association's ("APA") standards, which the Government is unable to confirm because the defense has not produced the underlying audio and video recording, among other information, "maintenance and adherence to [polygraph examination] standards are self-imposed and cannot adequately guarantee

14

the validity of the polygraph result." *Laurent*, 2022 WL 1467626, at *6 (quoting *Pavlenko*, 845 F. Supp. 2d at 1327; *Loaiza-Clavijo*, 2012 WL 529981, at *5).

Fourth, "polygraphs do not enjoy general acceptance from the scientific community" and cases in this circuit "'reflect a contemporary trend that questions the general acceptance of polygraph testing within the scientific community because of continuing questions about its reliability.'" *Id.* at *6 (quoting *Louiza-Clavijo*, 2012 WL 529975, at *7).

In addition to not satisfying four of the five *Daubert* factors regarding scientific knowledge, polygraph evidence also will not assist the jury. "Unlike other types of experts who assist the jury in understanding factual matters outside the juror's knowledge, a polygraph expert merely supplies the jury with another opinion, in addition to their own, as to whether the witness is telling the truth." *Laurent*, at *7 (quoting *Pavlenko*, 845 F. Supp. 2d at 1328). "[I]t is the role of the jury to make credibility determinations and permitting [polygraph expert] to testify as to Defendant's truthfulness invades the providence of the jury." *Laurent*, at *7. Far from assisting the jury, the polygraph evidence "may in fact confuse the jury or shift its focus away from determining guilt or innocence to collateral matters, such as determining the reliability of polygraph examinations." *Id.* (citing *Pavlenko*, 845 F. Supp. 2d at 1328; *Loaiza-Clavijo*, 2012 WL 529981, at *6)

## C. The Court Should Exclude Alexander's Polygraph Evidence Under Rule 403.

Even if Alexander had met his burden to demonstrate that polygraph evidence is relevant and admissible under Rule 702, *Daubert*, and other applicable Federal Rules of Evidence, the Court should still exclude the evidence under Rule 403 because its probative value is outweighed by the danger of unfair prejudice, confusion, or misleading the jury.[4] *Piccinonna I*, 885 F.2d at

---

[4]     Alexander's co-defendant may also be prejudiced by the admission of the polygraph evidence, given that Zusmer has not sought admission of their own polygraph results. That is, if Alexander is allowed to present evidence of his polygraph test, there is a material concern that the

1536; *Duque*, 176 F.R.D. at 695 (holding that even if Defendant established reliability and relevant of polygraph test, the proffered evidence would be inadmissible under Rule 403); *Evans*, 469 F. Supp. 2d at 1115 (same); *Pavlenko*, 845 F. Supp. 2d at 1327 (same); *Laurent*, 2022 WL 1467626, at *7 (same).

For example, in *Evans*, the district court excluded polygraph evidence under Rule 702 and *Daubert* but held that even if it determined that polygraph evidence was admissible under *Daubert*, it would have excluded the polygraph under Rule 403. *Evans*, 469 F. Supp. 2d at 1116. The Court explained that the scope of the polygraph test was "extremely limited when viewed in conjunction with the crimes charged in the fourth superseding indictment." *Id.* The court went on to say that given the "discrete and dubious nature of the questions as they relate to the allegations in the case … any probative value attendant to the polygraph evidence is substantially outweighed by the danger it could confuse or mislead the jury inasmuch as the jury could easily conclude that 'passing' the polygraph tests has more significance than is justified." *Id.* This is consistent with numerous other holdings excluding polygraph evidence under Rule 702 and, in the alternative, Rule 403. *See, e.g.*, *Pavlenko*, 845 F. Supp. 2d at 1328 ("Unlike other types of experts who assist the jury in understanding factual matters outside the jury's knowledge, a polygraph expert merely supplies the jury with another opinion, in addition to their own, as to whether the witness is telling the truth.") (quoting *Loaiza-Clavijo*, 2012 WL 529981, at *6); *see also Laurent*, 2022 WL 1467626, at *7; *Gilliard*, 133 F.3d at 815-16 (in a Medicare fraud case, it was not abuse of discretion to exclude a polygraph under Rule 403 because evidence of the polygraph would "shift

---

jurors may wonder why Zusmer has not taken a polygraph test and conclude that he is not being truthful.

16

the focus of a criminal trial from determining guilt or innocence to determining the validity of the scientific method at issue").

The same reasoning applies here. Orr asked Alexander only three generic questions, over which the Government had no input, and which pertain only to Alexander's knowledge of whether Silent Hill was "being used" for "illegal activity." The questions do not speak to Alexander's involvement in the Medicare enrollment process for Silent Hill, whether he signed the documents that the handwriting expert says he did not, or other material facts in the case. Thus, "[e]ven if the evidence were reliable," which it is not, "the questions [Orr] asked Defendant during the examination are not probative of Defendant's guilt or innocence. The only thing the polygraph examination proves is that the examinee believes his own story, not that the defendant's statements made outside the jury's presence in this case are true." *Laurent*, 2022 WL 1467626, at *7 (quoting *Norelus*, 628 F.3d at 1284-85). Therefore, "there is a real danger that the jury may accord undue weight to expert evidence that attempts to validate Defendant's testimony." *Pavlenko*, 845 F. Supp. 2d at 1327.

Finally, a jury is more than capable of evaluating the credibility of Alexander if he testifies and excluding the polygraph evidence would in no way impair his defense. *Scheffer*, 523 U.S. at 317 ("[w]e therefore cannot conclude that respondent's defense was significantly impaired by the exclusion of the polygraph evidence.").

## II.   ALEXANDER'S HANDWRITING EVIDENCE SHOULD BE EXCLUDED AS UNRELIABLE.

In line with the numerous other courts who have excluded similar handwriting analysis, this Court should reject Mr. Baggett as unqualified and his handwriting analysis as unreliable. *See, e.g.*, *Balimunkwe v. Bank of Am.,* 2015 WL 5167632 (S.D. Ohio Sept. 3, 2015). Mr. Baggett is not qualified to perform handwriting comparisons. There is no indication that his undergraduate

degree is of any relevance to handwriting. His resume states that he has testified in over 110 trials, but Defendant identifies no opinions where a court qualified Mr. Baggett as an expert. Mr. Baggett is the President of the International School of Forensic Document Examination, but that is an organization that he founded. Most of his lecturing engagements have been at this school. Courts have rejected handwriting experts with nearly identical "qualifications" from the same school. *Id.* at \*8-12 (excluding Curtis Baggett (not Bart Baggett) because his formal schooling did not pertain to handwriting analysis, the proponent did not present cases in which Curtis Baggett had been qualified as an expert, and most of Curtis Baggett's lecturing and instruction experience was at the "School of Forensic Document Examination at Handwriting University, the school started by Mr. [Curtis] Baggett's son."); *see also Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp.2d 1373 (M.D. Ga. 2006), *aff'd*, 201 F. App'x 681 (11th Cir. 2006); *Wheeler v. Olympia Sports Center, Inc.*, No. 03-265-P-H, 2004 WL 2287759 (D. Me. Oct. 12, 2004).

Mr. Baggett's proposed testimony is also unreliable under Rule 702 and *Daubert*. Mr. Baggett purported to analyze a "non-symbolic" signature. In other words, Mr. Baggett looked at a signature that contains no letters, much less distinct words or names, and somehow concluded that Alexander probably did not write it. Mr. Baggett reached this conclusion by comparing the non-distinct scribble to 16 known samples of Alexander's signature but provided no information on how those 16 samples were gathered and how the methodology for gathering those samples affected his analysis. Simply put, Mr. Baggett's methodology is non-existent as currently noticed and his opinion that Alexander probably did not make the scribble in question is unreliable. *See Balimunkwe*, 2015 WL 5167632, at \*12 (handwriting expert testimony unreliable where he "accepted plaintiffs' representations as to which signatures were authentic and which signatures were purportedly authored by another individual" and where "the standards he employed [were]

18

extremely discretionary."); *Rodriguez v. U.S. Bank, N.A.*, No. SA-12-CV-345-XR, 2013 WL 3146844, at *5 (W.D. Tex. June 18, 2013) (expert's affidavit not admissible as evidence that document was forged under Rule 702 because he did not explain any reliable principles or methods on which his opinion was based); *Brown v. Primerica Life Insurance Company*, No. 02 C 8175, 2006 WL 1155878, at *4 (N.D. Ill Apr. 29, 2006) (affidavit stating expert compared documents with known signatures to document with questioned signatures and determined the questioned signatures were forged was inadmissible under Rule 702; there was no indication that expert "applied any specialized knowledge or skills to the task he was asked to perform"); *Wheeler*, 2004 WL 2287759, at *4 (expert unreliable where he "offers no details about his methodology, beyond 'comparing' the handwriting on several documents," which is "insufficient to allow the court to determine whether his methodology could be tested, has been subjected to peer review, or is in accordance with applicable standards").

## III.   ALTERNATIVELY, THE COURT SHOULD HOLD A *DAUBERT* HEARING AND COMPEL ADDITIONAL DISCLOSURES.

Alexander has not met his burden to show that the proposed polygraph and handwriting evidence is reliable under Rule 702 and *Daubert* and the evidence is inadmissible for the additional reasons discussed herein.  Therefore, the evidence should be excluded entirely.  Short of that, the Court should not permit this evidence to be presented without first holding a *Daubert* hearing so that the Government can inquire regarding the proposed experts' opinions and methodology.  In addition, the Court should order Alexander to disclose:

- All results and reports of any polygraph administered to Alexander.
- All written communications between Alexander or his counsel (current or former) and any polygrapher.
- Any documents or materials provided to the polygrapher or relied upon by the polygrapher in drafting the report.

- Any audio or video recording of any polygraph.[5]
- The process for selecting the 16 handwriting samples that Baggett used as known Alexander samples.
- Prior testimony from Orr or Baggett.
- Retention/payment information for both experts.

### CONCLUSION

Given the dubious and irrelevant nature of the polygrapher's questions, the divergent expert views of polygraph evidence, the suspect scientific reliability and validity of the polygraph test, and the palpable danger that admitting the results of the polygraph test would lead to unfair prejudice, confusion and misapprehension by the jury, the polygraph evidence should be excluded. Likewise, the handwriting evidence should be excluded as unreliable. In the alternative, the Court should order additional disclosures and hold a *Daubert* hearing where the Government can inquire further as to these experts' opinions and methodology.

Dated:  August 24, 2022                    Respectfully Submitted,

                                           */s/ Jamie de Boer*
                                           JAMIE DE BOER
                                           FL Special Bar No. A5502601
                                           D. KEITH CLOUSER
                                           (FL Special Bar No. A5502882)
                                           MEREDITH HOUGH
                                           (FL Special Bar No. A5502915)
                                           (FL Bar No. 111553)
                                           Trial Attorneys
                                           U.S. Department of Justice
                                           Criminal Division, Fraud Section
                                           1400 New York Avenue, N.W.
                                           Washington, D.C. 20005
                                           Phone: (202) 304-6801
                                           jamie.deboer@usdoj.gov

                                           COUNSEL FOR THE UNITED STATES

---

[5]     Orr's report indicates that the polygraph was recorded.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 24, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By: _/s/ Jamie de Boer_