**Pages 1 - 148**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Before The Honorable Lauren Fleischer Louis, Magistrate Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. 21-CR-60253-KMM |
| | ) | |
| LAWRENCE ALEXANDER AND DEAN ZUSMER, | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Miami, Florida
Friday, October 7, 2022

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

Digital Audio Recording 9:31 a.m. - 12:48 p.m. = 197 minutes

**APPEARANCES:**

For Plaintiff:
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, Northwest, Eighth Floor
Washington, DC 20005
**BY:  D. KEITH CLOUSER, ESQ.
JAMIE DE BOER, ESQ.
MEREDITH HOUGH, ESQ.
JOANNA KATHERINE WOOD BOWMAN, ESQ.
ASSISTANT UNITED STATES ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Transcribed by:  James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

**APPEARANCES**:   (CONTINUED)

For Defendant Lawrence Alexander:
                         RICHARD C. KLUGH, P.A.
                         40 Northwest Third Street
                         Penthouse One
                         Miami, Florida 33128
                   BY:   **RICHARD CARROLL KLUGH, JR., ESQ.**
                         **ATTORNEY AT LAW**

                         QUINTERO BROCHE, P.A.
                         75 Valencia Avenue, Suite 800
                         Coral Gables, Florida 33134
                   BY:   **FRANK QUINTERO, JR., ESQ.**
                         **JOSE QUINON, ESQ.**
                         **ATTORNEYS AT LAW**

For Defendant Dean Zusmer:
                         LAW OFFICES OF BARRY M. WAX
                         701 Brickell Avenue, Suite 1550
                         Miami, Florida 33131
                   BY:   **BARRY MICHAEL WAX, ESQ.**
                         **ATTORNEY AT LAW**

**Friday - October 7, 2022**                                        **9:31 a.m.**

                                **P R O C E E D I N G S**

                                    ---oOo---

THE CLERK:  All rise.

The United States District Court for the Southern District of Florida is now in session, the Honorable Lauren Louis presiding.

THE COURT:  Good morning.

Please be seated.

THE CLERK:  Calling Case Number 21-60253-Criminal-Judge Moore, United States versus Lawrence Alexander and Dean Zusmer.

Counsel, would you please note your appearances for the record.

MR. CLOUSER:  Good morning, Your Honor.  Keith Clouser for the Government.

THE COURT:  Thank you.

MS. DE BOER:  Jamie de Boer for the Government.

THE COURT:  Thank you.

MS. HOUGH:  Meredith Hough for the Government.  Good morning.

THE COURT:  Hough?

MS. HOUGH:  Yes, Your Honor.

THE COURT:  Okay.

MS. HOUGH:  And I --

**MS. BOWMAN:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MS. BOWMAN:**  Joanna Bowman, the filter attorney.  I'm on the phone.

**THE COURT:**  Okay.  Thank you, Ms. Bowman.

Okay.

**MR. KLUGH:**  Good morning, Your Honor.  Richard Klugh, Jose Quinon, Frank Quintero for Lawrence Alexander.

**THE COURT:**  Oh.  There he is.  I was like, "Where's Frank Quintero?"  There he is.

Okay.

**MR. QUINTERO:**  Good morning, Your Honor.

**THE COURT:**  Good morning.

**MR. QUINTERO:**  Good to see you.

**MR. WAX:**  Good morning, Your Honor.  Barry Wax on behalf of Dr. Dean Zusmer, who's present in the front row.

**THE COURT:**  Thank you.

Okay.  Mr. Quinon, Mr. Quintero, your first time here.  Just make sure, please, that you use the microphone when you talk.

**MR. QUINON:**  Yes, Your Honor.

**THE COURT:**  Otherwise, you're not on the transcript.

I assume you're picking up where your predecessor left off with the motion to dismiss and Bill of Particulars.

**MR. QUINON:**  Yes, we are, Judge.

**THE COURT:**  Okay.  Who is arguing it?

**MR. QUINON:**  Mr. Klugh will.

**THE COURT:**  I thought so.

Come on up, Mr. Klugh.

**MR. KLUGH:**  Thank you, Your Honor.

**THE COURT:**  Mr. Klugh, there was not a reply filed; correct?

**MR. KLUGH:**  On the Bill of Particulars?

**THE COURT:**  Bill of Particulars.

**MR. KLUGH:**  We did not feel that one was necessary.

**THE COURT:**  Well, from my perspective, then, my question will be whether or not anything has changed either as a result of the Government's response or the discovery and its related procedures that we've been having here have changed the landscape of any of the requests on the Bill of Particulars.

**MR. KLUGH:**  I think the --

**THE COURT:**  But you don't have to start there.  Just know that that's my question.

**MR. KLUGH:**  I -- I think that the answer is that it definitely helps to inform and give flavor to some of the -- some of the points that -- we think it confirms everything that's transpired in terms of the hearings regarding discovery. We think it confirms what we presented in the Bill of Particulars motion.

Does the Court want to take that one up first?

**THE COURT:**  I don't have a preference.

**MR. KLUGH:**  Well, I'm happy to do that.

So --

**THE COURT:**  Okay.  I -- let's see how they relate to each other, so however you want to present it.

**MR. KLUGH:**  Yeah.

Our primary focus -- although we did have some reference to Count 19 in the Bill of Particulars motion, our primary focus was on Count 6.  We -- there -- there -- structurally, there are problems with Count 6 that make this a particularly important and -- need for a Bill of Particulars, structurally.

There's really three major structurally uniquenesses about this al- -- this count.  First -- the first one that I believe we've pointed out and we've talked about in the other hearings is that it's charged as a conspiracy to both -- violate two provisions of 1320a-7b.  1 prohibits offering a kickback, and 2 prohibits soliciting a kickback.

The Government is not -- has -- has, in some cases -- I've seen three or four reported cases -- done this before in which they've charged as conspirators, both the offerors and the solicitors, in the same count of conspiracy.

But in each of the other reported cases, in -- for the Eleventh Circuit's purpose, I want to refer to the *Monty Grow* case, which is a published case recently of some note in -- in this circuit due to a reversal on -- on the -- on that count,

on the main count of conspiracy.

But the point is that not -- there was not -- it was not a problem in *Monty* -- in the *Monty Grow* case because what you had there was Grow was operating as -- as an intermediary company between the distributor and -- of certain creams, medical creams, and the patients.

And what he did was both receive kickbacks, and what his groups -- his group of individuals that were working for him -- both received kickbacks from the distributor and paid kickbacks to patients. And so it was appropriate, in that context, in that indictment, to charge him with a conspiracy to both solicit and offer to pay kickbacks.

In this case, what the Government has done has no precedent. They have charged -- tried to glom together in one conspiracy indictment -- and I do want to get to the other two points before -- to make sure the Court knows the whole of the argument.

The glom in one conspiracy count -- individuals that they have separately charged with soliciting and individuals that they've separately charged with -- with offering kickbacks. Importantly, Dr. Alexander is charged with neither type of substantive offense.

But what they have done, it appears -- and, you know, we still are in the position, and depending on the ruling on the Bill of Particulars motion, of filing a motion to dismiss -- is

saying to the Court that either there is a facial problem here or we need a Bill of Particulars because the statute, 1320a-7b, is as specific as you can be.

These are two completely separate offenses.  This is not one overarching offense.  If you get involved in any kind of kickback thing, you're responsible for all the kickbacks.  It's very separate things.  The -- there's a statute prohibiting the offeror, and there's a statute prohibiting the solicitor.

So what -- what the Government has done is at least requires us to say, "Are we in the *Monty Grow* position?"  Are they -- are they saying that Dr. Alexander was conspiring, or was part of a group that was conspiring, to receive a benefit from the kickbacks?

Or, as we assume and would be the subject of a motion to dismiss, is it the case that, no, the Government has some solicitors and some offerors and glommed them together into one conspiracy, contrary to case law?  And so that's what one of the focuses of the Bill of Particulars motion is.

And the Government has not cited any other example nor any other theory, particularly in the context of 1320a of Title 42, that would support this sort of improper conspiratorial thing.  But if there is a way to get out of it, it should be resolved by a Bill of Particulars.

The second important point about the Bill of Particulars comes from the Government's own -- not only their response in

this case, but in just about every filing since we filed the motion for a Bill of Particulars, the Government continues to refer to Count 6 as a health care fraud conspiracy.

And it's clearly -- it's intentional.  It's clearly -- it's purposeful, and that needs to be resolved because it is not charged as a health care fraud conspiracy.  We've referred to it, perhaps not precisely, as a *Klein* conspiracy.  A *Klein* conspiracy, of course, is -- is when the target is the IRS, but the -- in this case, the Government is saying the target is the HHS.

But this is not a fraud conspiracy in the sense that we use the term "fraud."  We don't think that the Government keeps referring to it as a health care fraud conspiracy, and health care fraud has a very specific statutory meaning.  So either they are subtly or unsubtly trying to constructively amend the indictment or they don't understand their indictment or something else is going on.  Either way, a Bill of Particulars is required.

The -- the -- we believe that the -- that -- again, the Government has blended the two -- two subsections of -- or two components -- two prongs of 18, U.S.C., 371 in -- in Count 6, the conspiracy to defraud prong, which -- and the -- and the conspiracy to violate statutes.  The one I was talking about earlier was the conspiracy to violate statutes.

They clearly have that misanalyzed because one

conspiracy -- you have -- you have two separate statutory (Inaudible).  There is no -- we've just been over that.

But as to the conspiracy to defraud, the Supreme Court in the *Tanner* case, the Eleventh Circuit en banc in the *Falcone* case and other cases -- the *Adkinson* case, the famous *Adkinson* case that gets reversed because of the change in the law in -- during the course of the trial -- all explain that a conspiracy to defraud in this context, whether it's the IRS or the HHS or whatever, and whether you call it a *Klein* conspiracy or give it some other name, is not a conspiracy to commit fraud within the meaning that the Government is using the term "health care fraud" over and over and over again in its pleadings.

It is a conspiracy to obstruct, in some way, the administration of a federal agency, the agency here being the HHS.

Because that type of vague nature of a charge, in and of itself, is problematic and because the Government still, in its own pleadings, cannot resolve what it's -- what it's alleging here in terms of this count, all the points we're making about the Bill of Particulars either need to be resolved or the Government needs to, once and for all, abandon this notion that there -- that this is a health care fraud conspiracy.

And -- and so most of our arguments deal with that.

**THE COURT:**  Why?

**MR. KLUGH:**  Because it's not a health care fraud

conspiracy.  The word --

**THE COURT:**  But why does that matter?  If they're being imprecise, I don't -- I don't understand how that is misleading your client.

**MR. KLUGH:**  Well, let me give you an example just to -- an immediate example for double jeopardy purposes.

If the -- if the obstruction is the -- that there -- the defendants are conspiring to solicit kickbacks, that is important for us to know what that -- what the obstruction is. What is the difference between these various objects?  If the obstruction is to offer kickbacks, we need to know that.

Again -- and I want to go back- -- backwards a little bit to talk about this indictment.  This is not the usual indictment where somebody coming in cold can read this indictment and understand immediately, "Oh, I see why this man's been charged."

As the Court knows, we were fighting for months over whether there was even a signed application that is -- was the basis for a prior belief that the defendant did something that must have carried forward to doing something else, and -- and that was the only allegation that is clear.

First of all, it was the only substantive allegation -- the substantive allegation is Count -- Count 19 -- that in whatever type of application that was or submission that was -- that it was incomplete with regard to the ownership of

Silent Hill.  That's the entirety of the substantive allegations against this defendant.

There are additional references in the multi-object Count 6 to, again, a submission of a prior application in 2016, which -- again, that's the one we've resolved -- was not signed by -- by anybody literally.  There was no actual signature by anybody, nor was there -- is there a linkage of anything to -- specifically to this defendant in the discovery.

The linkage -- there's a reference in discovery to something that happened months before that suggested some document could be -- that he was authorized to have somebody else sign a document months before, and that's how de minimus the allegations are.

So in a -- in a -- generally -- generally, in a *Klein* conspiracy, you don't need to trouble yourself with -- with what the allegation is because it's clear that you're trying to obstruct the IRS in its application of the -- its -- its sole function, which is revenue collection.

But here, again, the Government has not charged health care fraud.  They've alleged it only now in their pleadings -- or their filings -- motion -- response filings and other motion filings, and they've had these very de minimus allegations of a follow-up form in 2019 that was incomplete.

And so they clearly want to have a playing field that allows them to go places that the indictment doesn't say it's

going, including health care fraud, including something else. I don't know what else.  That's -- that's why the Bill of Particulars is necessary.

But if the Court is going to let them go forward on this health care fraud matter over -- over -- at trial over -- what would be over our objection, at least there should be a Bill of Particulars.

It's like -- when did he find out about -- about the fraud?  When are you saying he joined this fraud conspiracy, this plan to defraud Medicare?  What -- what is your -- your -- you know, your allegation about this?

Again, the -- the -- it's the uniqueness of this that -- the Government charges one thing, which is an obstruction-of-function conspiracy, and proceeds in its -- every answer it gives about discovery or about every other litigation in this case as if it's a health care fraud conspiracy, which distorts the whole basis of our being able to go forward and defend.

And in the indictment itself, there's no allegation at all that suggests that Mr. Alexander was aware of any health care fraud, of any false billing, of any unnecessary billing, of any excessive billing, anything -- of any services that weren't needed, of any services that weren't performed.  There's no such allegation and not just no -- no count but no -- no background allegation, no -- nothing.

So the -- as the Court says, the answer to what difference does it make -- it makes lot of difference we're front -- when we're in front of a jury, and the Government suddenly tries to convict Dr. Alexander on Count 6 for health care fraud, and we don't have anything.  And that's, you know, one of the fundamental reasons why a Bill of Particulars is -- is needed there.

Let's see.  The types of things we're asking about -- again, the Government says, "Oh.  Well, the" -- their primary response is "We've already told them."  But, again, they haven't already told us.  They haven't told us anything about his involvement in a health care fraud conspiracy that they are saying that this count now charges.

And the only thing that -- they've left us in a lurch in terms of what is the scope of this conspiracy to obstruct the function of -- of HHS.  Is it just -- is it just the 2016 application?  Is it really just the enrollment application in 2016?

Again, one of the problems with that is that you've got a time bar.  That application is filed more than five years before the indictment, and any overt acts by the defendant that's alleged in that case is well before that.  So, again, these issues that we've talked about of "Tell us when he gets involved" are not -- A, they're not resolved by the Government.

The Government says, "Oh, well, we've told you because the

conspiracy started in 2014 and continued on until such and such and such and such."  But, again, we know that the conspiracy is -- has its own problems.  We don't know what they're talking about when [sic] the conspiracy.  We don't know whether they're alleging something relating to health care fraud.

So these elements of the Bill of Particulars that we're seeking with regard to the timing of -- of Dr. Alexander's involvement, knowledge, consent, and what exactly he did.

The one other form of overt act that they allege -- and this, in theory, would support their allegation of -- in Count 6 of conspiracy to offer kickbacks -- is that they -- they allege that there were some agreements that he either signed, or somebody signed his name on, to hire a Mr. Davidovic, who has pled guilty.

Now, the Government, you know, in terms of how has the discovery helped us resolve those particulars -- well, Mr. Davidovic has been interviewed on multiple occasions.  He said, "Yeah, I had all kinds of interactions with Dr. Alexander.  None of them had anything to do with this."

So discovery is not curing the problem.  The -- the -- and the handwriting analysis -- you know, we have a handwriting expert who's disputing whether Dr. Alexander is even signing them.  So is that going to be -- is that a separate conspiracy? Is that just part of the con- -- let's say 6B of the conspiracy to offer?  What is the Government going -- how is the

Government going to try to relate that to 6A?

The types of things we're asking here are not -- particularly where the Government is saying, "Oh, well, it's just discovery, and it's just resolved," it -- they're not just discovery, and they're not resolved.  There are unique problems with this indictment.  There are unique problems in the way the Government is construing the indictment and where they've announced they're going to go with the indictment.

A Bill of Particulars is warranted.  It's been granted in similar contexts by District Courts.

THE COURT:  Can --

MR. KLUGH:  It's been denied in -- by other District Courts in other -- other contexts that don't rise to this level.

THE COURT:  What examples would you point me to for courts that have granted Bill of Particulars in similar contexts?

MR. KLUGH:  Well, I think it -- there's a case from July 8th, *United States v. Jackson*, at 2022 Westlaw 2643584.

THE COURT:  Sorry.  264- --

MR. KLUGH:  -3584.

And the facts are slightly different there in terms of the Government -- the Court finds more game-playing by the Government than we're alleging.  I'm not necessarily alleging game-playing by the Government.  I'm alleging that they don't

understand the count.

And it might look like game-playing.  I don't -- I'm not saying it's game-playing, but it has the exact effect from purpose -- for the purposes of trial.

THE COURT:  I -- I am trying to understand the argument that you're making that's based on the Government's characterization in pleadings that this case alleges a health care fraud.

Dr. Zusmer -- -man, your codefendant -- he's charged with health care fraud in this case.  Yeah?

MR. KLUGH:  Dr. Zusmer has some counts on health care fraud and health care fraud conspiracy, yeah.

THE COURT:  Okay.  I understand that your client's not charged in that --

MR. KLUGH:  No.

THE COURT:  -- but you -- your argument's predicated, in part, on the confusion that you say arises by the Government characterizing, in its filings in this case, that this is a health care fraud case.

MR. KLUGH:  Yes.

THE COURT:  And it seems like that charge is, in fact, going to be tried with respect to the codefendant, and it seems like a fair characterization.

So I'm trying to understand, in this two-defendant -- what's left as a two-defendant case, why that gives rise to the

need for a Bill of Particulars or why it's not a fair -- why it demonstrates that the Government --

**MR. KLUGH:**  Well --

**THE COURT:**  -- doesn't understand the case.

**MR. KLUGH:**  -- we're not asking for a Bill of Particulars on Count 1, the health care fraud conspiracy. We're not charged, we're not mentioned in any manner or means. There's no overt acts relating to us.

**THE COURT:**  I don't think that -- I don't -- I don't know that I asked my question well, then.

Part of your argument here now is that the Government is, I think you just said, like, not necessarily playing games. But because they don't understand the conspiracy in which your client is charged, you need a Bill of Particulars.

And you're evidencing the Government's lack of understanding that's confusing your client by the fact that, in pleadings that are generic to this case, they have characterized this as a health care fraud.  And it seems to me that that's a fair characterization.

**MR. KLUGH:**  So if I can just reply, to -- that are generic to this case.  No, I'm talking about pleadings as to the Alexander motions.

And repeatedly, like, five -- three or four times in relation to Alexander motions -- the Government, in its most recent filing of a -- of a notice of intent to introduce

evidence against Alexander, refer to him being charged with health care fraud conspiracy.

This is not some generic reference to Zusmer I'm talking about. This is -- I'm not making this up. I'm talking about they continually refer to Count 6 as a health care fraud conspiracy, Count 6.

And that is very problematic because if they get away with it, we're not going to have a fair trial, and -- and we're going to have -- violate double jeopardy and all kinds of other problems because they're blending and mixing these -- these multiple objects.

You're going to have a nonunanimous verdict on Object 6A. You're going to have some jurors finding, "Oh, he conspired to offer" and then some jurors finding, "Oh, well, he conspired to fill out a form." It's really problematic, and --

THE COURT: Well --

MR. KLUGH: -- and then -- if -- some jurors then will be convicting because they don't understand that he's not really charged with the health care fraud.

It's --

THE COURT: But, Mr. Klugh, I --

MR. KLUGH: This is not the ordinary case.

THE COURT: Okay. I don't -- I don't think you're making it up. I'm going to look at the notice just because I'm trying to, again, understand what seems like the predicate, in

part, for your argument, which is that the Government is causing this confusion.

But what you're arguing now, that they should not be able to argue to the jury that your client is charged in a health care fraud case -- if he's not, that's a motion in limine, not a motion to dismiss or for Bill of Particulars.  No?

**MR. KLUGH:**  Your Honor, we don't know what the indictment is going to be treated as when we get into the -- to trial.  We don't know what trial rulings are going to be made, in limine or otherwise.

What we want to know is what does the indictment charge, and can we fix that now as we try to finish -- finish the last 30 days of this case, when we have to start announcing witnesses and exhibits.  We want to know what we're charged with, and that's a completely separate matter from the Sixth Amendment right.  That's a Fifth Amendment right, and we're entitled to it.

And there is no comparable case where a Bill of Particulars has been denied.  I -- there's no comparable case where they've done this before.  I have never seen this done before.  Usually, when they -- I call it a *Klein* conspiracy.  However you want to call it, it's an interference conspiracy, if you want to not use the word "*Klein*."

I've never seen the Government fudge and fudge and fudge, either before trial or after trial, and say, "No.  Well, it was

really a conspiracy to defraud financially."  It's never -- it's -- there's no precedent for it.  They should give us the details.  They should tell us what they're alleging, and that enables us to file a correct motion to dismiss rather than us throwing targets at a -- at a -- at a bullseye that is behind a curtain.

The -- the other -- again, the statute of limitations issue is not insignificant.  It is not insignificant at all because if -- if they agree that what -- that they are charging separate conspiracies, one of which is a conspiracy to offer bribes -- offer kickbacks, and another is a conspiracy to interfere by -- by not filling out 855S correctly, then it's important that we know that so that we can proceed with the appropriate statute of limitations motion on the 855S count and -- and on that prong of the -- of the Count 6 conspiracy because if all 6A is about is the same thing that Count 19 is about, then, you know, we should have the opportunity to address that, either by motion or otherwise, because of:

A.   The statute of limitations issue; and

B.   Because of other factors relating to the elements of that case.

There's -- again, the Government has not explained exactly what its harm is -- what the harm is in telling us in this context.  The Government simply says, "We've answered these things already," and that answer is incorrect.  They've said

that "It's clear that we've answered it already by calling it a health care fraud conspiracy."

It's clear that that has created more of a problem.  It's also clear that, in an unprecedented way, they've charged the two prongs of 1320a with indictment allegations that, on their face, refute those -- the combination of those two in one count, one conspiracy count.

The types of things we're asking for -- I don't see -- I haven't seen the Government say, "Oh, my God.  We'll be revealing something that's terribly harmful to us to reveal at an early date."  I haven't seen that.

There's no -- there's no allegation that this will do anything other, in this 10-million-document case, than help the defense prepare to meet the charges, to identify what evidence it wishes to offer and prepare, what it needs to defend against and what it doesn't need to defend against.

The -- the whole point of having trials is to have fair trials.  You will not find, in any reported case, as thin a set of allegations regarding a defendant in a -- a multi-prong conspiracy indictment.  Somebody -- somebody told Dr. Alexander to sign a form he didn't even sign.  Some -- some follow-up form filed in 2019 didn't have all the information on it.

That's it.  You know, on its face, it's borderline, at best, as evidence of a conspiracy.  It's -- they've got -- we have problems as to what should be charged, what is charged,

what they are alleging, what they're not alleging.

This is a case where a Bill of Particulars helps move the trial forward, helps speed up the trial, helps the defense prepare, and it's -- there's absolutely no prejudice to the Government whatsoever.

The things we've asked for -- the Government has not -- not -- again, has not said any of them would create specific harm to the Government or damages their ability to prosecute the case, exposes a witness, anything.

**THE COURT:**  That's not how I understand the standard.

**MR. KLUGH:**  No.  The standard -- the standard is discretionary, but the standard comes into greater relief because -- it's discretionary pretrial, but it comes into greater relief once we get to trial because then you have the double jeopardy issues.  Then you have the due process issues.  Then you have the constructive amendment issues.

And, again, if we're in trial and we still haven't resolved on a Bill of Particulars, if their theory on Count 6 is to somehow "health care fraud conspiracy" and that has somehow managed to get in front of the jury, then we have a problem.

There's nothing in the indictment that says anything about this defendant being involved in a health care fraud conspiracy, nothing, and that is unique.  The Court cannot find another case that we -- I could not find another case.  Let's

put it that way.  The Court might -- maybe -- I'm not sure the -- but -- you know, finding something more than I can.

But I could not find a case where you have a defendant who's facing an extremely vague interference count, borderline statute of limitations on the allegation, the overt act.  One overt act that specifically relates to something that doesn't relate to the -- to the statutory offenses is barred by the statute of limitations.

The other allegation is one -- again, is some document that -- there's not even an allegation that this defendant knew it was sent in.  That's how borderline it is.  And I'm not making a Rule 29 argument, but I want to be in a position to be able to make one, and that's really -- again, the whole purpose of a trial is a fair trial.  This is not to bother the Government, to abuse the Government.

Every factor in this case -- the Government says it's not a needle-in-a-haystack case.  When you start expanding the scope of the -- of the charge verbally without -- apparently, it has not been stopped on it yet, and -- and you have literally more than half a hundred different discovery productions in this case that are massive.

They don't -- you cannot even put the discovery in this case on a giant hard drive.  That's how big this is.  It is -- some of it's massive amounts in the -- in the Internet, massive amounts in various drives.  To -- to leave this case without a

Bill of Particulars on this thin of an allegation, you reach a due process problem, and that's where discretion is abused in the Bill of Particulars context.

The fact that there is no prejudice to the Government certainly weighs in favor of granting it in this case.

**THE COURT:** Okay.  Thank you, Mr. Klugh.

**MR. CLOUSER:** Good morning, Your Honor.  Keith Clouser for the Government.

**THE COURT:** Good morning.

**MR. CLOUSER:** So the indictment charges in Count 6 a three-part conspiracy charge under 371, the first part being a conspiracy to impair/impede/obstruct HHS.

The second part is to knowingly and willfully offer and pay health care fraud -- health care kickbacks.  And the third is to receive -- solicit and receive health care kickbacks, and the individuals charged in that count include both owners of the DME companies and marketers.

And so when the defendant asserts that he is not charged with a conspiracy to commit fraud, I'm not sure what the defense is referring to.

The indictment lays out, in great detail, the manner and means of the conspiracy, which includes several paragraphs that identify and describe the defendant's role and also includes, in extensive detail, overt acts committed in furtherance of the conspiracy, including acts committed by the defendant.

And of note, the acts include the August 16th -- oh -- sorry -- August 2016 855 form but also include signatures by Lawrence Alexander on marketing agreements that are described in the indictment as false marketing agreements that were part of the kickback conspiracy.  So the indictment clearly lays out what Dr. Alexander is charged with in Count 6.

In terms of the motion for Bill of Particulars, critically, the Government has provided not only the extensive discovery in this case -- and we don't make any qualms.  It is voluminous discovery, but because of the fact that it is voluminous discovery, the Government has met with former defense counsel and talked through key documents and the Government's theories of the case.

The Government has provided draft exhibit lists which list out the documents that the Government expects to use in proving its case, and the Government has provided all of the interview reports with coconspirators that lay out Dr. Alexander's role in the conspiracy.

So from -- with all of that, no Bill of Particulars is necessary because the defendant has all the information necessary to understand the charges leveled against him and to respond to them at trial.

**THE COURT:**  Mr. Clouser, should I understand from that response that all of the information sought in the Bill of Protect -- Particulars has been provided by the

Government?

MR. CLOUSER:  Through discovery and other means, yes.

THE COURT:  Then what's the objection to putting it in a format that would look like a Bill of Particulars?

MR. CLOUSER:  Well, the objection is that we've done this several times.  We've met with their counsel, and it is just additional work that is not called for by the law and is not necessary here.

The indictment is sufficient and lays out precisely what the charges are.  It lays out the conspiracy that Dr. Alexander is charged with, and it is a conspiracy to defraud the United States in the -- with the *Klein* conspiracy language and a conspiracy to pay and receive kickbacks.  And all of that is incorporated in the -- in the indictment.

And, you know, with all of the materials and the time that the Government has spent sort of providing information to the defense, an additional round of, you know, providing that material again is unnecessary and burdensome on the Government.

THE COURT:  Just by way of example, either through the discovery or in meeting with defense counsel, you've identified the date and the manner in which Dr. Alexander joined the conspiracy alleged in Count 6?

MR. CLOUSER:  Yeah.

The indictment itself provides that -- the first overt act involving Dr. Alexander is August 2016, in which he caused a

representative of Silent Hill to electronically submit Form 855.

Now --

THE COURT:  So am I to understand, from your answer, that's the first date in which he joined the conspiracy?

MR. CLOUSER:  No.  He may have joined earlier, but that is the first date that is alleged in the indictment.

THE COURT:  Is that the first date for which the Government intends to advance evidence?

MR. CLOUSER:  The conspiracy started in 2014, and the Government intends to advance evidence of Dr. Alexander joining the conspiracy through, for example, the testimony of his coconspirator, Jeremy Waxman, about them discussing the -- you know, the potential creation of the -- or sorry -- the potential -- the implementation of using Silent Hill as a DME company as part of the conspiracy.

THE COURT:  Okay.  But I understood from your prior answer that all of this information has also been provided.  So if it's Dr. Waxman who -- or actually just Mr. Waxman -- I'm sorry -- Waxman --

MR. CLOUSER:  Yeah.

THE COURT:  -- who is going to provide that testimony, what is the time frame that he is going to testify that Dr. Alexander and he started the conspiracy?

MR. CLOUSER:  Your Honor, I don't recall precisely

offhand the -- the initial date on which Dr. Alexander is -- joined the conspiracy with Jeremy Waxman.  That information is contained in the interview reports with Jeremy Waxman that have been produced to the defense.

What Jeremy Waxman will say about Dr. Alexander's role and when he joined is contained in those reports.

**THE COURT:**  Okay.  I -- I know that you don't have them there at the podium, but you have a level of confidence that, by looking at -- excuse me -- at those specific interview reports, that will disclose when the Government's evidence shows Dr. Alexander joined the conspiracy?

**MR. CLOUSER:**  I am confident of that.

**THE COURT:**  Okay.  The -- I'm looking just at other examples that I myself just think that they're discrete enough to -- to talk about at the hearing.

Oh.  There it is.  I was about to say, "I can't find it, but I know I read it."

The -- this one relates to both motions.  Are you handling the motion to dismiss?

**MR. CLOUSER:**  I am.

**THE COURT:**  Okay.  Then I don't feel bad asking you.

The -- one of the questions asks you to identify what specific billing was associated with the filing of the form and the enrollment materiality of the allegedly false document, which I think relates to the 2016 enrollment form.

Is it your contention that that answer has been provided either through consultation with Counsel or in the discovery?

**MR. CLOUSER:** If I understand this sort of request correctly, the request is the billing information that was sort of as a result of the -- the 2016 application, which would be all of the Medicare billing for Silent Hill -- that has been provided in claims data.

**THE COURT:** Here's how I understand it --

**MR. CLOUSER:** Sure.

**THE COURT:** -- again, with the benefit of the motion to dismiss. And Mr. Klugh will tell me if I'm wrong, but the way that I understand it is the enrollment form --

**MR. CLOUSER:** Uh-huh.

**THE COURT:** -- is not -- does not itself seek reimbursement; right? It is not -- it is not submitted for the purpose of billing Medicaid -- Medicare.

**MR. CLOUSER:** Well --

**THE COURT:** So that's, I think, part of it.

So how -- how did the Government extrapolate an enrollment form and call it in connection with billing? I think that's part of what they're seeking in this one. Relatedly, the materiality of the allegedly false document -- in what way was it material that Dr. Alexander concealed ownership of Silent Hill when submitting that form?

So I think I view sort of two asks in this question, and

ultimately my question to you is:  Is it your position that you've answered both of those in this process to date?

MR. CLOUSER:  It is our position that we've answered those and in a couple of ways.

The first --

THE COURT:  Start by telling me what those answers are because I think that that may also help me for the motion to dismiss.

MR. CLOUSER:  So the -- the enrollment document is directly related to billing.  In order to bill Medicare, you must enroll and get a billing identifier to submit claims.  In fact, that is the reason to enroll in Medicare.

A DME provider could provide DME to other people.  You can buy DME at Walmart, but in order to bill Medicare, you need to enroll in Medicare as a provider.  And so that's the direct connection between the enrollment document and billing.

And the question as to what claims sort of follow from that is you submit claims to Medicare using that biller NPI. So if you do not have an NPI, you cannot submit the claims to Medicare.  So that enrollment NPI is what is appended to the claims to allow you to get reimbursed.

And so each iteration of the enrollment document -- and to be clear, Count 19 charges a later enrollment document that -- that is dated January 14th, 2019.  But in order to submit claims, you -- a DME supplier has to be enrolled in Medicare

and has to have that NPI, and that -- the enrollment documents are required in order to obtain them.

THE COURT:  I somewhat expected that answer, but the -- oh.

The other part of it, though, the materiality?

MR. CLOUSER:  In terms of the materiality of the false statement?  Is that --

THE COURT:  The -- of concealing the ownership in the enrollment form.

MR. CLOUSER:  Okay.  Concealing the ownership -- and if you don't mind, I -- let me inquire.  Thank you.

Yeah.

THE COURT:  I know the indictment charges that if they have revealed the true ownership, then it wouldn't have issued.

MR. CLOUSER:  Uh-huh.

THE COURT:  Is that the sum and substance of it?

MR. CLOUSER:  In the indictment -- that is the basis for materiality in the indictment, but --

THE COURT:  Can I ask, though, why?  Why wouldn't it have issued if his name or Waxman's name was on it?

MR. CLOUSER:  Because if the -- if CMS had known that the ownership was false, they --

THE COURT:  Well, not that it was false, but if it -- the allegation is that he concealed his --

MR. CLOUSER:  Uh-huh.

**THE COURT:** -- and Waxman's.

So what is the materiality of them not having put their own names on?

**MR. CLOUSER:** Because part of the process here is so that CMS can identify who owns which DMEs, and one of the allegations in this indictment is that the purpose of concealing the -- the true ownership of each DME was so that they could consistently bill Medicare, even if one of the entities was audited.

That's the reason why CMS requires you to disclose ownership, is so that it can connect different entities in the event of an audit or in the event that somebody is, you know, charged with a crime that would require exclusion.

**THE COURT:** So was Alexander otherwise associated with any other DME facility at the time that he filled out this enrollment --

**MR. CLOUSER:** No.

**THE COURT:** -- for Silent Hill?

**MR. CLOUSER:** Not that we're aware of, but Jeremy Waxman was.

And so the idea -- the charge here is that they conspired to conceal Jeremy Waxman's ownership of multiple DMEs by using Dr. Alexander, Dr. Zusmer, and others to own -- to purportedly own DMEs. And in Dr. Alexander's case, they didn't disclose Dr. Alexander's identity -- or ownership, either. Instead,

they used his relatives.

THE COURT: Okay.

MR. CLOUSER: And to -- with respect to the sort of materiality, we anticipate --

THE COURT: We -- can I just write -- take --

MR. CLOUSER: Sorry.

THE COURT: -- notes really quickly? Sorry.

MR. CLOUSER: Yeah.

My apologies.

THE COURT: Okay. Sorry.

MR. CLOUSER: Sorry.

With respect to the materiality, that is a factual issue that we will, you know, present at trial. But among other things, we'll present a Medicare expert who will testify as to the materiality of this information in the enrollment forms.

THE COURT: I --

MR. CLOUSER: In addition, in the enrollment form itself, it provides that -- that falsifying information in the application could result in the revocation of Medicare billing privileges. That's part of the certification that one makes when they sign this enrollment form.

And, ultimately, we will present evidence that things as simple as having the wrong hours for your DME to be open can result in, and did result in, a pulling of billing. They stopped paying until that was fixed.

And so the -- the Government will present evidence at trial that this is, in fact, material to the decision to pay.

**THE COURT:**  Okay.  All right.  I took you off script.  Go ahead.

**MR. CLOUSER:**  All right.  One other piece that I wanted to clarify that defense counsel raised is the 2016 no actual signature.

I think we've discussed this pretty extensively.  There is, in fact, a signature.  It is an electronic signature.  We've produced evidence of that.  It is referenced in the indictment, in fact, as an electronic submission.

And so it's unclear what the linkage is to that issue, but I don't think that that warrants a Bill of Particulars on any of the -- the issues.  We've sort of extensively worked through precisely how it was submitted and produced documents to that effect.

And in addition, there was a discussion about the handwriting expert to say that maybe Dr. Alexander didn't sign the documents that he's purported to sign in the indictment.  Obviously, that's a factual issue that the jury is entitled to evaluate.

And we have evidence that, in fact, Dr. Alexander has signed other things in his own practice that -- with a very similar signature that we intend to introduce at trial.  So that's a factual dispute that should be resolved at trial.

**THE COURT:**  Will you respond to Mr. Klugh's argument about the confusion arising or failure to understand the charges by calling it a health care fraud?

**MR. CLOUSER:**  So the -- I will attempt to.

The conspiracy charge charges three prongs, and it is a conspiracy to defraud the United States charged in a typical way under 371 and a conspiracy to pay and receive health care kickbacks.

The fraud charged here is a conspiracy to, among other things, disguise ownership so that HHS cannot sort of link these companies together and then a conspiracy to pay and receive health care kickbacks.

And Dr. Alexander is charged, along with Jeremy Waxman, Dean Zusmer, his other coconspirators, and two marketers, Ronald Davidovic and Umut Vardar.

And so the conspiracy that we have charged Dr. Alexander with is a conspiracy to defraud the United States and to commit these two types of kickback offenses.

**THE COURT:**  Have you identified the kickback offenses that Dr. Alexander is charged with knowing or causing or benefiting from or being related to, or is it just generically that he knew kickbacks were happening?

**MR. CLOUSER:**  Dr. Alexander is not charged with any substantive kickback count.  And so it is, generically, he is aware of the conspiracy and the purposes of the conspiracy and

the manner and means in which the conspiracy was effected.

Dr. Alexander did sign sham contracts with the marketers, as alleged in the indictment, and so his -- the indictment does provide information regarding his knowledge about his role in the conspiracy.

THE COURT:  Okay.  But that's one of their bullet points on the Bill of Particulars, whether he knew that the contracting parties would not perform the services they agreed to perform.

I -- I mean, again, Mr. Klugh will tell me if I'm wrong, but I sort of read that as what is the evidence that you have that Dr. Alexander knew that the contracting parties would not perform the services they agreed to perform.

Would it be your position that you've disclosed the answer to that in your discovery or in consultation with Counsel?

MR. CLOUSER:  It is our position that we've disclosed that and primarily through the interview reports and documents produced by Jeremy Waxman, who describes Dr. Alexander -- who describes his understanding of Dr. Alexander's knowledge and what he has told Dr. Alexander about the conspiracy at the time.

THE COURT:  So last time we were here, if memory serves, there was a proffer from former defense counsel that the interview notes that had been produced for Dr. Waxman -- is he a doctor?  I keep saying that.  Just "Mr. Waxman"?

**MR. CLOUSER:**  I don't believe so.  Yes, "Mr. Waxman."

**THE COURT:**  Sorry.

I get -- so the -- the -- the notes did not reveal that Waxman had told Alexander the fraudulent nature or that these were kickbacks.

Do you disagree with that proffer?

**MR. CLOUSER:**  I do.

I -- the interview report does indicate that, to my recollection -- that Dr. Alexander -- that Jeremy Waxman and Dr. Alexander discussed the -- the scheme and that Dr. Alexander knew the nature of the conspiracy.

**THE COURT:**  Okay.  That's a little high-level.

Are you telling me that there's a report that corroborates that -- and you anticipate that Waxman is going to tell the jury that he told Alexander that there was a kickback conspiracy going on relating to Silent Hill?

**MR. CLOUSER:**  We do.  I -- you know, obviously, we don't have it in front of me, and I don't want to misstate what is in the interview report itself.

But my understanding is that it does include that information and that we do anticipate that Mr. Waxman will testify that Dr. Alexander knew about the conspiracy, including how patients were obtained, how doctors' orders were obtained.

**THE COURT:**  I don't mean to be ticky-tacky with you, but there's a difference between Waxman's ability, in a

proffer, to say, "Sure, Alexander knew" and your anticipation that he's going to tell a jury, "Before Alexander signed this marketing agreement, I told him that this was a kickback scheme."

I'm wondering -- trial is less than a month away.  You have to have a good handle on what your cooperator is going to say.  Is he going to say that?

MR. CLOUSER:  We anticipate him testifying that Dr. Alexander knew at the time how the conspiracy worked, yeah.

THE COURT:  Because Waxman told him or because Waxman knows that some other way?

MR. CLOUSER:  I think -- because Waxman talked to him about it and also because of the -- the nature of the conspiracy, I think Waxman will say, you know, "This is what we were doing, and there's no other way to have done what we did."

THE COURT:  Okay.  Because, in part, of the marketing materials that Alexander is credited with signing or entering?

MR. CLOUSER:  I'm sorry.  Ms. -- Dr. Alexander is credited with signing?  Yes.

THE COURT:  Right.

Sorry.  I was just con- -- when you say that "This is the only way it worked" --

MR. CLOUSER:  Uh-huh.

THE COURT:  -- the marketing materials fill in part of that informational gap, do they not?

**MR. CLOUSER:**  Yes, they do, and also bank records fill in part of the informational gap, records to which Dr. Alexander had access.

**THE COURT:**  Okay.  And less generically, when we say that this was a kickback scheme, is the "this" in that sentence Silent Hill's enrollment and billing to CMS?

**MR. CLOUSER:**  Yes --

**THE COURT:**  Okay.

**MR. CLOUSER:**  -- along with the other DMEs.  But with respect to Dr. Alexander, yes, Silent Hill's enrollment and billing was all part of a kickback scheme.

**THE COURT:**  Is this a health care fraud?

**MR. CLOUSER:**  The -- the activity was, in fact, health care fraud.  But with respect to Dr. Alexander, it is charged as a kickback conspiracy rather than a conspiracy to commit health care fraud under 1349.

**THE COURT:**  It's -- is it the Government's intention to tell the jury that this -- that Dr. Alexander perpetuated a health care fraud?

**MR. CLOUSER:**  No.  We intend to tell the jury that Dr. Alexander committed the -- the acts and engaged in the charges that he is -- you know, that are leveled against him, which is a conspiracy to defraud the United States by impeding the Health and Human Services and CMS and paying and receiving health care kickbacks.

**THE COURT:** Okay. I -- I took you off script a lot. I appreciate the patience.

Is there anything else that you want to respond to?

**MR. CLOUSER:** Unless the Court has other questions, I -- I do not --

**THE COURT:** Okay.

**MR. CLOUSER:** -- have anything else to add.

**THE COURT:** Okay. Thank you, Mr. Clouser.

**MR. CLOUSER:** Thank you, Your Honor.

**MR. KLUGH:** Your Honor, as occurs frequently in appellate briefing, the Government answered everything that it could and omitted any answer whatsoever with regard to the question of what are the particulars of a conspiracy to receive kickbacks in this case.

What -- under what possible theory are -- is the Government proceeding that Dr. Alexander conspired to receive kickbacks, or is it, what appears obvious to us, a dichotomy that there was -- there were people who conspired to pay and people who conspired to receive these -- it's a single statute, two prongs of the same statute.

It's not -- you -- to charge -- to say, "Well, we've got all that. We've got solicitors, and we've got offerors. So we'll put them together in one conspiracy," that can be done, as in the *Grow* case, but this is not the *Grow* case.

You do not have Dr. Alexander, as far as we know,

soliciting kickbacks, and the Government doesn't -- did not even respond with one word to that argument, Your Honor.  And that alone is enough to require a Bill of Particulars as to 6C, as we refer to it, that object.

The -- there -- it's clearly -- and, again, if we have the particulars, we -- possibly, we obviate the need for the motion to dismiss.  If we don't have the particulars, we have a more vague motion to dismiss.

The -- the -- the Government opened its argument by saying the defendant claims he is not charged with fraud.  Again, this -- this is why a Bill of Particulars is required, the word "fraud."  It means these vastly different things going in vastly different -- different directions.

We have not claimed he's not charged with fraud in the *Klein* -- I'll put quotes around that because it's not a true *Klein* conspiracy in the *Klein* conspiracy way.  We have not disputed that.  We believe that to be the case.

But today, for the first time, we hear the Government saying, "Well, we will not allege, or try to prove to the jury, that Dr. Alexander was part of a health care fraud" -- "any health care fraud, that he did not try to commit any health care fraud offenses."  I think that's important, again, when we get to the motion to dismiss on Count 19, but -- but it's also important here.

The reason why this -- the distinction, of course, is the

clear Eleventh Circuit law that kickbacks is not part of fraud. The *Medina* -- the *Medina* case -- Pura -- Pura Medina was the person involved in that case.  It's a well-known Eleventh Circuit case from about 15 years ago -- made it very clear that kickbacks does not defraud.  Kickbacks is something Medicare doesn't want people to do, but it's not fraud.

The remaining allegation of -- and, again, the Government has added some -- some clarification that we would like to have in a Bill of Particulars as to the impeding.  The Government now is alleging that -- and this contradicts the indictment in a couple of ways -- that the conspiracy under 6A relates to concealing some role by Jeremy Waxman in relation to the Silent Hill operation.

I think they -- as I understand it today, they've abandoned what -- what prior counsel had spent a fortune, literally a fortune, defending against, which was that there was some materiality to withholding Dr. Alexander's name and -- and from -- and put -- and had instead -- having his mother be the -- the -- the owner of the company.

And I think the Government, in -- in answering the Court's question, said, "No, it wouldn't have affected anything.  It didn't have any material impact whatsoever."

And the Government -- I think the Court quite correctly picked up on the Government's bootstrapping argument as -- you can't create an -- an allegation on the bootstrapping premise

of "Well, if you lie in your" -- "in a form to Medicare, Medicare will kick you out of the program."  That's not a -- not a viable basis for 1035.

But, again, turning back to the Bill of Particulars part of this, the -- the -- we need a Bill of Particulars on 6C unequivocally, the soliciting and offering component of the conspiracy.  The only thing they have alleged is that somebody either put a contract in front of Dr. Alexander or Dr. Alexander otherwise signed, or somebody signed for him, a con- -- a marketing contract at one point in time.

I mean, this is a distinct period of time.  Like, December of 2017, a marketing contract was signed.  And, again, this -- the Government says that's enough of a Bill of Particulars.

That is -- is -- and the Government says, "Well, now we've added to that, that Waxman will say that" -- "that" -- in a conclusory way, apparently -- "that Dr. Alexander knew that the only way this operates is with kickbacks, that the only way you can run a DME company was with kickbacks," which, of course, is, again, a novel concept.

And -- but, again, that sort of thing should be in a Bill of Particulars as well rather than on the vagaries of whatever Waxman -- who was going to say -- and, you know, just as an aside -- and I don't mean to disparage.  We still have not gotten, I don't believe, the transcript of the hearing -- the plea hearing, where his drug/alcohol addiction and mental

health problems are mentioned.

But, again, this is where the Bill of Particulars lies right now, in -- in the mind of that individual, apparently, and that's not where it should be.  If the Government believes him, put it in the Bill of Particulars.  If the Government doesn't believe him, don't tell us we have to defend against it, and that's on the 6B part of it.

With regard to 6A, again, the -- the Government refers to, "Oh, we've" -- "we've spoken to prior counsel."  Again, in speaking to prior counsel, I'd just outline prior counsel, who just left the case, had -- had fully been under the impression that the case was all about hiding Dr. -- Dr. Alexander's name from the -- from the form because that's -- that's what -- that's what they thought.  That's what -- why they polygraphed him and -- part of the reasons why they polygraphed him and other reasons.

So it didn't -- the prior -- prior conversations did not resolve 6A, what that object was.  In no -- in no way did it -- did they resolve.  Today, we're left with vagueness.  The Government says, "Well, we've provided a preliminary exhibit list."

Again, even that exhibit list -- out of the 10 million documents, there's an exhibit list now with more than 2,000 documents, again, none of them saying anything, none of them saying anything about Dr. Alexander's knowledge that this

electronically -- not actually signed, electronically signed -- document -- he didn't even know it went out, much less how it was prepared or anything about its submission.

That's the Government -- so if they did know -- if the Government is going to come in and say, "Yeah, we're going to prove that" -- "that he knew that this form was submitted in August 2016," then, you know, give us some particulars.  Let us defend against it.

Maybe there's an alibi.  Maybe, you know, we're saying, "Oh, yeah, there was a conversation in" -- "in" -- you know, "with Waxman and Alexander on August 15th of 2016," and maybe it turns out, oh, Dr. Alexander was in the Bahamas, or it couldn't have happened.  These are -- these are really important things in terms of enabling a defense to what is an extraordinarily defensible case at this point, based on what we've heard.

The -- the Government says, "Well, it all" -- "all shows" -- "we've shown them he's involved in the conspiracy at the beginning."  Our question is not "involved in the conspiracy."  Our question is in what -- you know, first of all, it's in what conspiracy?

What is 6A about?  Is it just about now -- can we rely on it from a Bill of Particulars standpoint?  Is it just about failing to disclose some position that Waxman had in Silent Hill?  Is that 6A, or is it something else?  Let us know

now so we can make our double jeopardy arguments, so we can prepare our defense.

The other part of it -- the defendant has all the information -- all the information has been given to us. Again, "needle in a haystack" is used in many cases, but this is truly a needle-in-a-haystack case in terms of the 10 million documents.

I think the Government came up with -- one time with prior counsel ten documents that we called -- labeled "hot documents."  It was referred to in our first hearing.  Those are the documents that sent defense counsel in the wrong direction in the first place.

Those are the documents that sent defense counsel spending a fortune on trying to prove that there was no intent to conceal Dr. Alexander's involvement in it in multiple ways. That's why we hired the -- the handwriting experts.  That's why we did all these things, essentially, to show that -- some of that.  The -- so it's simply not true.

Rather than turn a transcript of this hearing into a quasi-unusable Bill of Particulars, just have the Government answer the question.  So the Government says, "Well, I don't remember what Waxman says" or "I don't remember one thing or another," and I understand that.  I don't remember it all, either, but what is the harm in having a fair trial?

You know, if they want to amend the Bill of Particulars,

they can amend the Bill of Particulars.  It's not affixed in stone.  I've seen a Bill of Particulars amended five times.  It doesn't -- it's not the worst thing that ever happened to them.

THE COURT:  In this district?

MR. KLUGH:  In this district?  No, in DC.  In DC, I've seen it a lot, you know, and -- and it's the capital of our country.

So --

THE COURT:  I don't mean to disparage other courts.  I just thought that if it was this one, I could use "Utilities" and look at the case and just see what occurred.

MR. KLUGH:  Well --

THE COURT:  So that's the only reason I was asking, Mr. Klugh.

MR. KLUGH:  -- Greg Sitzmann is the case that -- that I'm thinking of, Paul Friedman, well-known District Judge in -- in Washington, DC.

It doesn't -- it doesn't bind them, and that Bill of Particulars -- you know, I don't like that one.  It was over 300 particulars in length, but I don't think this one's going to be 300 particulars.  I think this one's going to be, like, five or six.

This is not -- this is not so burdensome.  This is "Go back and read what Waxman said, and if you believe this and you tell us we're going to have to confront this, then tell us."

And if it's something other than what Waxman said, fine, because Davidovic says Waxman's lying.

**THE COURT:** When you say that it would be five or six things, the motion certainly seeks more than five or six things.

What five or six things would you advance with the benefit of all of the -- all that has changed in the landscape of this case since your motion for Bill of Particulars was filed? What are the items that you contend are still unknown and necessary to defend?

**MR. KLUGH:** Manner and means of the conspiracy not alleged in the indictment. That's probably -- that's an easy -- none.

**THE COURT:** Well, Mr. Klugh, you're going to have to -- I'm -- this -- I think this might be a forest for the trees issue. I know you know what you meant, what you just said there, but I don't.

**MR. KLUGH:** Well, they allege manner and means of the conspiracy.

**THE COURT:** They do.

**MR. KLUGH:** And, again, it's important that, if there's something else now that Waxman's come forward and he's -- and they're basically using him to -- constructively and in the indictment -- it's particularly -- it makes it more reasonable now to have the Bill of Particulars. We're not

going to go back.

And so that's -- that's the way to -- that's the way to handle that.

THE COURT:  Okay.

MR. KLUGH:  If there's some --

THE COURT:  Still trying to con- -- to put words around what you're saying here.

Your -- it's your position that they should have to provide a Bill of Particulars to identify any manner and means of the conspiracy that has not been alleged in the indictment?

MR. KLUGH:  With respect to Dr. Alexander.  I should put that caveat on there and --

THE COURT:  Have you seen -- it would be helpful to me if you were aware of an example where -- where that relief was both granted -- I would be interested to see both what the order said and what the Bill of Particulars read.

Do you know of one in this district that I could look at?

MR. KLUGH:  I -- I mean, I know -- the problem with -- when the defense wins is that the Government doesn't have a right of appeal.

So you end up with a distortion always in every case, in every circumstance, what the case law says, because almost always you're going to find a Courts of Appeals affirming or not affirming, on an abuse of discretion basis, rulings of trial courts.  And, usually, it's after trial where a harmless

error burden -- a harmless error standard applies.

So it's really -- you know, to say -- when the Government comes up with a case, I say, "Well, that's a problem."  Have they come up with a case that covers this with all those opportunities they have?  They have not, and -- and, you know, they have -- nor have they said why it's so burdensome.

They have -- you know, this is a case where discretion calls for granting these -- these really limited types of things.  They say they -- "we're going to" -- "we can't identify the date and manner in which Dr. Alexander joined the conspiracy."  Why not?  And -- and I'm trying to stick with 6A when I say 5 or 6.

And then, you know, can you, you know, clarify Dr. Alexander's role?  Is it -- his role is to sign documents, or is it to not sign documents?  It's to not object when documents are signed?  What is his -- what is he doing?  How is he -- what is his participation in this conspiracy if there is more to it than -- than we see, which is zero participation?

Then -- I'm just trying to, again, separate out the -- the Government has answered -- I believe identified the complete contents with regard to the document in 855S by saying there were no attachments at all in Count 19.  So I think they've answered that one.

**THE COURT:**  I think I've seen the attachments in our last hearing.

**MR. KLUGH:**  That was to 2016.

**THE COURT:**  Oh.  I beg your pardon.

Which one, then?  You're referring to the --

**MR. KLUGH:**  Count 19 has -- is only relating to --

**THE COURT:**  The 2019 -- okay.

**MR. KLUGH:**  It's to 20- -- so it's -- it's a parity there, 19 and '19.

The -- they've said there's no attachments, and I -- you know, of course, they haven't explained the significance of that.  That --

**THE COURT:**  No.  We went through it last time.  It recites the attachments that were on the 2016 application.  It just recites them, remember?

**MR. KLUGH:**  There's a -- there's a reference to the 2016 application.  There's a reference to it, yes.

**THE COURT:**  And it's --

**MR. KLUGH:**  But I don't -- I don't -- I don't know if it recites --

**THE COURT:**  It has the file names with respect to all of the 2016 attachments?

**MR. KLUGH:**  That may be the case.  I do not remember that from that form, but, again, I think they've answered that one.  That's -- my point is that they have answered that one.

So I'm just trying to focus on -- on 6A -- 6A, the most important one, again, and I think it relates also to

Count 19 -- is what is the theory?  What was Waxman's role that wasn't disclosed?  You know, just tell us.  Was he an owner?  Was he -- was he an employee?  Was he a manager?  Was he -- what was he?

And, you know, you said there's materiality, you know, and your expert -- is your expert going to come in and say -- you know, we got an expert disclosure a day ago, but was it -- basically, disclose who the expert was, not what he's going to say.  What is he going to say?  Is he going to say what Waxman was?  I don't know.

Who's going to say it?  Is Waxman going to say it?  I don't see that in the -- in the reports, to be honest with you. The -- what is the theory that Waxman's role -- because the -- as I understand it, they've narrowed it now to Waxman, is what was material to the -- in terms of the omission.  Why was it material?  What was he?

**THE COURT:**  The indictment itself identifies Waxman as the beneficial -- or having the beneficial owner interests.

**MR. KLUGH:**  It identifies him as having some kind of beneficial interest, of some kind of interest or being some kind of manager.  Again, it does not track the language of 855S.

The -- just specify --

**THE COURT:**  What language of 855S?  What are you referring to?

**MR. KLUGH:**  Well, the requirements of the form, of which you have to disclose and what you don't have to disclose.

**THE COURT:**  So this is one of those places where I know you know your argument really well, but you're not flushing it out for me.

**MR. KLUGH:**  Well, it's because the Government has this way of being trusted, and the defense doesn't.  The Government comes up here and says, "Oh, it's material.  It's material.  We have an expert who's going to say it's material."

What is he going to say?  Was he going to say it's material because Waxman is X, and the form requires the disclosure of X?  I want to know what X is, and I want to find out if it's really X and Y or X and X.

Again, the -- is -- the Government's answer, apparently, to the question of "Identify payment transactions relevant to Count 6" is that the defendant -- that Dr. Alexander had some form of access or could have accessed information that could have led him to believe that a payment was made.

But, again, we don't know what payments are the kickback payments, what payments are not kickback payments, and we have no idea how they -- whether they're alleging that he did know, or is there -- again, is -- are they limiting their allegation to he might have known if he had tracked it down like Sherlock Holmes?  If they're -- if that's the allegation, then let us know ahead of time.

The overt acts -- you know, we've cited cases from other districts in which the overt acts are -- are listed.  But, again, if Waxman's -- whatever Waxman comes up with at the -- at trial is going to be the overt act when these others fall away.  It's really not going to be a fair trial.

So just -- if you know of other overt acts, if you know of anything else that Dr. Alexander did, then not know about the electronic filing in 2016, not sign anything in 2016, not sign anything in 2019, not know about what was filed in 2019, not know there was anything wrong with two contracts basically the same day that said nothing or gave no hint about any kickbacks -- if there's some other overt act than all of those innocent or nonexistent things, let us know, please.

It's -- it's just simple fairness.  It's not -- it's not a big ask when they've, again -- and the Court says it doesn't have to grant it just because it doesn't hurt the Government, but the fact that it doesn't hurt the Government is a very good reason to -- to exercise discretion in this case in our favor.

The -- let's see.  Those -- those, I think, are the principal -- principal ones on 6A.  I think the others -- it would be easier to finish up with them when we talk about Count 19, dismissal.

**THE COURT:**  Okay.  Should we transition there, then?

**MR. KLUGH:**  If the Court's ready to do that, I -- yes. I'll go get my file.

**MR. CLOUSER:**  Your Honor, may I briefly respond to --

**THE COURT:**  Okay.

**MR. CLOUSER:**  -- one or two things?

**MR. KLUGH:**  I'll just get this out of the way for you.

**MR. CLOUSER:**  Thank you.

Just -- just briefly, the Government does not concede or suggest that the withholding of Dr. Alexander's ownership interest is not material.  In fact, it's the withholding of anybody's interest, Mr. Waxman's and Dr. Alexander's interests in Silent Hill.  That is part of the allegations, as charged in the indictment.

Obviously, Mr. Waxman held a number of other DMEs, but Dr. Alexander had a -- separate businesses that could have influenced and affected his ability to continue to bill as an owner of Silent Hill.

The -- the ask appears to be an ask for every fact that has been, you know, developed through the evidence, and the Government has produced all of the information that it has obtained to the defense.

And there is prejudice for the Government having to go back and essentially redo that process, and the prejudice is the Government has already sought and been denied a motion to continue.  We are working diligently to prepare this case for trial.

And, you know, every time we provide information, the

defense does not agree to -- you know, does not accept -- for example, we've spent now -- this is the third hearing where we've been discussing the nature of the signature on the 2016 application.  The Government can't do -- there's not more that we can do to -- to show or to provide evidence about that signature and the nature of it.

In addition, to clarify, the CMS -- the Medicare expert that we were talking about was Stephen Quindoza, who was disclosed to the defense in -- on April 6th, 2022, and he is the person who will be testifying at trial about the materiality of the -- the enrollment forms, as disclosed in that notice of expert witness.

**THE COURT:**  Wait.

Is that a different expert than the one who's supposed to just testify about CMS procedures?

**MR. CLOUSER:**  Yes.

So the -- the expert that we disclosed on Wednesday is an expert who is -- was disclosed to testify, as sort of requested by -- you know, sort of during the discovery conference, about the enrollment process specifically as a technical expert, you know, how an electronic enrollment can happen, what is an electronic signature, and how that process works.

Stephen Quindoza is a Medicare expert who will testify about the -- the rules and regulations of Medicare, the claims submitted in this case, the enrollment documents submitted in

this case, and the ownership interests reflected therein and --
and the -- the materiality and connection with billing.

THE COURT:  Okay.

MR. CLOUSER:  So -- one moment.

And with respect to the argument that the Government has not provided any information regarding Dr. Alexander's role in the conspiracy with respect to the kickbacks, that's not accurate.  The Government has produced emails and communications with Dr. Alexander, including communications between Jeremy Waxman and Dr. Alexander relating to the conspiracy.

And in the indictment itself, it reflects that Dr. Alexander was the signatory on marketing contracts that were part of -- on sham marketing contracts that were part of the conspiracy to pay and receive kickbacks.

These con- --

THE COURT:  What made them sham?

MR. CLOUSER:  That they did not accurately reflect the nature of the agreement that they would be paying per -- you know, paying the marketer kickbacks to recruit patients.

THE COURT:  Wait.

What does that mean, that the amounts disclosed in the materials were false?

MR. CLOUSER:  If I can direct to Paragraph --
Paragraph 5 -- or I'm sorry -- Paragraph 5 of Count 6 in the

indictment on Page 24.

So it states that on or about January 1st, 2017, at the direction of Jeremy Waxman, Lawrence Alexander signed a sales and marketing agreement with a patient recruiter, which falsely described that the patient recruiter would provide marketing and back office services to Silent --

THE COURT: Wait.

I'm sorry. What page are you on?

MR. CLOUSER: So Page 24 of the indictment.

THE COURT: I always forget that the page -- the paragraphs renumber.

MR. CLOUSER: Yeah, they renumber.

THE COURT: Okay. I have it.

MR. CLOUSER: And so that identifies that it falsely describes that the patient recruiter would provide marketing and back office services in exchange for $4200 per week.

And then the next paragraph similarly describes another false agreement, in which it falsely provided that there would be health care operations and business processes for Silent Hill at a rate of 2800 per week.

And --

THE COURT: What's the falsity?

MR. CLOUSER: That's not the nature of the arrangements with those marketers. In fact, the arrangement was a kickback arrangement to pay for referrals.

THE COURT:  And how do we know that?

MR. CLOUSER:  The evidence in this case reflects that that is, in fact, the -- the nature of the arrangement, and the indictment alleges that.

THE COURT:  Where does it allege it?

MR. CLOUSER:  Oh.  Sure.

THE COURT:  I should hope --

MR. CLOUSER:  Yeah.

THE COURT:  -- that the evidence somewhere shows that. I was looking for something more specific.

MR. CLOUSER:  Sure.

In the allegations, on Page 22 of the indictment, Paragraph 11, Jeremy Waxman, Lawrence Alexander, Dean Zusmer, Individual 1, and other coconspirators paid, and caused to be paid, kickbacks and bribes to patient recruiters, including Ronald Davidovic and Umut Vardar, through Lead Creations, as well as SYL Marketing, in exchange for referring beneficiaries and doctors' orders for braces to Equilibrium, Silent Hill, West Bay, and Active Assist.

THE COURT:  Okay.  All right.  So I understand the falsity there on Paragraph 6, that they would comply with the federal antikickback statute -- yes? -- because you allege that they did, in fact, participate in a kickback scheme.

MR. CLOUSER:  Yes.

THE COURT:  But what's the falsity with respect to the

services that they were to provide?  That they didn't provide them?  That they didn't pay 4200 per week?

**MR. CLOUSER:**  Both, that they -- they were -- they were not providing marketing and back office services.  Instead, they were selling doctors' orders.

**THE COURT:**  Okay.  So there won't be any evidence -- or the evidence will show that there wasn't any services that were provided that were contracted for?

**MR. CLOUSER:**  Correct.  The evidence will show that these were sham contracts and that they falsely reflected a different set of services than were being provided.

**THE COURT:**  Okay.

**MR. CLOUSER:**  If the Court does not have any further questions, I think that I can --

**THE COURT:**  Okay.

**MR. CLOUSER:**  -- sit down.

**MR. KLUGH:**  Your Honor, is the Court going to address the -- the -- these -- the discovery component as well today?

**THE COURT:**  Yes.

**MR. KLUGH:**  I think that it's relevant, in part, to the -- to the rebuttal -- the surrebuttal by -- by the Government.

There are three additional reasons why the Bill of Particulars in this case is -- is particularly warranted and to -- the first is that the Government has now said that

they're basically going to have -- they're going to try to call two experts, again, with very limited -- very limited summaries given so far -- I couldn't pin down what either one is going to say on materiality -- to testify to try to establish materiality of -- of some action by Dr. Alexander, two experts but no Bill of Particulars.

That's -- that's out of balance, two experts, no detailed summary, and no Bill of Particulars, just to establish -- just so we can get to materiality.  That's a big problem in this case for -- for us.

The second thing is very important in this case.  This case has been handled for more than a year now.  It will be a year and a month during the post-indictment phase by one lead prosecutor.  That lead prosecutor, for the first time today, is no longer the lead prosecutor and soon will not be involved in the case at all, apparently.

And so when all that the Government talks about, "Well, you know, we made these representations.  You can rely on this.  We gave" -- "we sent you this," all of the decisions, all of the communications, all -- everything that, arguably, prior counsel was relying on, this is -- makes that as a much more shaky foundation than any ordinary case because we have a new prosecutor, who may have a very different view of the case and the theories and the limitations as we go along.

There is -- it comes back to one of the discovery issues.

The Government says, "Well, the Bill of Particulars is in some transmission between Waxman and Alexander."  We're not aware of any transmission between Waxman and Alexander that is -- certainly is, in any way, facially incriminatory.

There's nothing, you know, that says, "Oh, you know, we've got to pay these people kickbacks, and we've got to be careful" or something, nothing -- I mean, nothing -- not only not in that level but nothing in a -- in a matrix extrapolation of that level, nothing like that.

But we, again, are at the point now where the Government is -- and we don't know how many days before trial, if trial -- or whether it will be during trial -- will conclude with its anticipated review of the recently-made-available cell communications by Waxman that we made our requests about at the first hearing because we believe that the totality of those transmissions is going to absolutely refute the notion that Waxman and Alexander were team players.

It's going to show that they were on different teams.  In other words, it's going to show that what Waxman was doing is inconsistent with conspiring in the ways that the Government says.  And where we are right now is the Government is saying they have no possibility of even getting to the point of identifying potentially privileged material until just over two weeks before trial.

Again, that is a factor as well that the Court should rely

on to grant a Bill of Particulars so that, no matter where the Government goes at the last minute -- and we can establish our prejudice, if they go in some different direction, or how they try to -- we can at least have something that we can rely on, that we can go forward at trial and say, "Well, we're getting discovery on the third day of trial, but we know what the" -- "what the allegations are."  So whenever this comes out, you know, we'll do the best we can with it.

Again, the Government itself recognized the need that there would be problems in this transition.  The Court, in the interest of moving the case forward, denied that request.

But also, in the interest of moving the case forward and so that we can resolve all of these things effectively -- is just give us the Bill of Particulars so we can go forward and get everything resolved as fast as possible and so, when the late discovery comes in, you know, after jury selection, we're in a better position to handle it.

And to turn to the motion to dismiss, the Government's theory with regard to Count 19 is, as I believe they concede, novel.  There is no prior precedent for saying that something that has nothing to do with the submission of a bill or the application for payment in any sense is to be treated as if it were an application for payment.

On -- you know, under the Government's theory, anything -- any -- any action taken by a defendant who is getting involved

in Medicare -- if -- if the defendant at -- again, it's unstated because we have no Bill of Particulars -- at some later point in time believes that there's going to be some kind of improper billing -- that the prior -- prior statement can somehow relate back to it.

And it's just not consistent with the statute.  It's not consistent with the whole statutory scheme.  There are a whole bunch of false statement statutes in the United States Code.  They're very -- they're distinct, and they're very specific, and the Supreme Court has been very specific with regards to -- to each of them, false -- and in the bank context, in other contexts, the 1014 statements.

1035 is equally specific.  It cannot be any false statement to Medicare by somebody who, at some point in time in the future, is thinking about possibly submitting a health care fraud claim to -- to Medicare.  It -- it -- it may or may not, you know, violate some other statute to submit some kind of an erroneous thing, but it -- it cannot be that this statement was in connection with billing.

It renders the statute, all of that statutory language, completely superfluous because what they want the statute to read right now is if you make a statute to Medicare and you -- you know, you are, or may become, a provider, then you've made a false statement in connection with billing.

And -- and we would urge this Court not to become the

first court to agree with that proposition.  It doesn't -- every doctrine of statutory interpretation -- just about every doctrine, but, certainly, the doctrine that says that Congress does not include specific language, limiting language for no reason whatsoever, is -- is at play here.

This is a statute about false billing.  Every example -- the *Melgen* case is the one that we cited to that has the best analysis, I -- we think, by the Eleventh Circuit in terms of how you can relate -- how far you can go in relating a false statement.

And in *Melgen*, they went as far as to say, "Well, even though he was charged with" -- "the false statements he was charged with was not the actual billing submission.  It was not the actual claim for billing.  He" -- "he created specific patient records that would be allied with and support the billing."

And so there was a sufficient linkage between the specific billing and the false records created relating to the patient condition and the treatment made that permits us to say, "Okay.  That" -- "that satisfies 1035."

And here, the Government, again, has made no pretense -- and while it's not as clear as their bootstrapping argument with regard to, "Well" -- with regard to materiality, that "Well, if you make a false statement, it's material," it's very -- very much like that, and it's very much like -- they --

they are saying that materiality must be completely divorced from billing as well as you must also completely divorce the "in connection with" language.

So there's basically two fundamental problems with their analysis.  They want it to be completely immaterial to the appropriateness of the -- the absence of any health care fraud in -- in the billing and -- in the *Medina* sense, and it has to be also not in connection with any billing.

And under their theory, the crime was complete as of the time the application was filed.  Under --

THE COURT:  In 2019 --

MR. KLUGH:  Yeah.

It --

THE COURT:  -- the Count 19 application -- or enrollment form?

MR. KLUGH:  I -- yes, Judge, that's right.  That's right.

And, again, you know, under their theory, there doesn't have to be any billing.  It can't be -- that's -- that is their theory, that there doesn't have to be billing, that you just have to -- again, I don't know how they describe this 2019 application.  I don't know whether they finally have landed on a terminology for this document that they're going to use.

It is an 855S form, and I don't know what their latest expert is going to say about it.  I don't know how that's going

to relate to what Dr. Quindoza says about it, but it doesn't matter because it's not for billing.  It's not in connection with billing.  It's connect- -- it's in connection with applying to be a Medicare provider, and that's it.

I think the Government said something today, "Well, if you make a false statement about your billing hours, they might not let you" -- I don't know what -- I mean, this is completely far into the indictment.  I have no idea what that is about, and that goes back to the Bill of Particulars, of course.

But the -- the bottom line here is it's simply a matter of line-drawing -- statutory line-drawing, and Congress has drawn the line.  They didn't make this a generic false statement to Medicare statute.  The Government wants it to be a false statement to Medicare statute.

We'd ask the Court to dismiss Count 19.

**THE COURT:**  Thank you, Mr. Klugh.

**MR. WAX:**  Is it my argument now or the Government?

**THE COURT:**  No.  Go ahead, Mr. Wax, please.

**MR. WAX:**  Yeah.

Okay.  Thank you.

Yeah.  Uh-huh.

Good morning, Your Honor.

**THE COURT:**  Mr. Wax.

**MR. WAX:**  Judge, as a predicate matter, I would just ask that the Court grant our motion to adopt the motion to

dismiss Count 19, as applied to Count 21, on behalf of Dr. Zusmer.  As we've established in the motion to adopt, the allegations are identical.

THE COURT:  It's my intention --

MR. WAX:  Yes.  I assumed.

THE COURT:  -- to recommend the motion to adopt.

MR. WAX:  Thank you, Your Honor.

And to that extent, I would also incorporate, by reference, the arguments previously made by Mr. Klugh both in -- during his motion for Bill of Particulars, when the issue came up, and, of course, at this time based upon that.

THE COURT:  I understood that to be your intention.

MR. WAX:  All right.  Thank you.

So, Your Honor, I think Mr. Klugh really articulated it well in the sense that the Government's position is basically if you submit a false Form 80- -- 855S application to obtain a national provider identifier and you never bill, you are guilty.

And as I see it, our position, in a straightforward manner, is that submission of the Form 855S is not a payment claim submission.  It's not made in connection with the provision or billing for health care services.

Now, in this particular instance, Your Honor, with respect to Count 21 and, of course, Count 19, the indictment specifically alleges a materially false, fictitious, and

fraudulent statement by signing and submitting Form 855S certifying that Dean Zusmer was the sole owner and managing employee of Active Assist when he knew that Jeremy Waxman also had ownership and/or management control of Active Assist DME. And this is the essential nature of the allegation.

Now, our position, Your Honor, is that statements on enrollment applications which are not related to billing -- directly related to billing do not constitute false statements under 18, U.S.C., 1035 and Subsection (a)(2).

And as Mr. Klugh pointed out, the *Melgen* case really does establish that because in the *Melgen* case, of course, you had patient treatment charts which related directly and supported this specific billing.

So the cases that were cited in the motion to dismiss Count 19, which we've adopted -- and in particular, I think it was *United States ex rel. Williams v. Renal Care Group*. That deals with a False Claims Act civil complaint, but the statutes are very similar, and the one point that I think is important from *Williams v. Renal Care* is pointing out that the Medicare Form 855S is a regulatory document.

Essentially, as part of the Code of Federal Regulations, it's saying, in order to get a national provider identifier, you have to go ahead and submit the Form 855S. You can't get a national provider identifier without being approved.

And so a violation of that form, putting something on that

form which may, in fact, not be true -- and I don't concede that to be the case here, but if, in fact, as the Government alleges, it's not true -- may subject you to some regulatory penalty.

It may subject you to revocation of your national provider identifier; it may subject you to fines; it may subject you to audits or prepayment reviews, but it doesn't necessarily result in criminal responsibility.  And if Congress had wanted it to result in criminal responsibility, they would have said so, and I think that's part and parcel of what Mr. Klugh was urging.

So that linkage, as -- as it was described, just does not exist here because, again, going back to, really, the essence of what our argument is -- is just merely submitting the form cannot be divorced from billing.  It just cannot be.

If I understand the Government's theory correct, they're saying if you make a false statement on an 855S, then you are guilty of a violation of 1035(a)(2).  And that's just not the case because there is no showing that it's in connection with billing.

And the Government, in drafting the indictment, indicated specifically that the way that they violated 1035(a)(2) was by submitting what they believed to be a false and fraudulent form, not by billing.  That's not what the indictment says. They just say "in connection with billing."

So by their theory, submission of this form, by necessity,

has to be in connection with billing because basically what they're saying is you couldn't have billed at any time unless you were already approved by Medicare.

And by the way, Your Honor, the Government has taken a position, if I heard them correctly in their argument -- which is that if Jeremy Waxman's name had been disclosed -- that, by virtue of his ownership of other DME companies, he would have been den- -- they would have been denied a national provider identify -- identification number.  Now, not only is that not alleged in the indictment, but it's -- it -- there's no basis for that argument.

And I think they also said that Dr. Alexander owned other businesses where he had submitted Form 855 and obtained a national provider identifier number for those, and that may or would have resulted in a denial of the application for Silent Hill.  And I don't think that's a factually accurate statement.

Now, perhaps I misunderstood what the Government said, but I, you know --

**THE COURT:**  I just think I may have been the one that said that because I, as I sit here, remember saying, when we came out, that I thought I had read that in the indictment.

So I --

**MR. WAX:**  Well, the indictment, Your Honor -- and I'll look specifically at Count 21.  It says that --

**THE COURT:**  What I'm relying on, in case it was me --

**MR. WAX:**  Right.

**THE COURT:**  -- came from Count 6, not 21.  And I'm just trying to find the language that I think I was relying on in case I'm the one creating a problem for you.

**MR. WAX:**  No, it's not a problem, Judge.  I mean, Count 6 is, if I'm not mistaken, a conspiracy count.

**THE COURT:**  Yes.

**MR. WAX:**  So this is not a conspiracy count.  This is a substantive count where Dr. Zusmer is charged as a principal --

**THE COURT:**  Uh-huh.

**MR. WAX:**  -- under 18, U.S.C., 2.

So consequently -- you know, we've even conceded in the -- in the reply to the Government's response to the motion to dismiss Count 19 -- conceded that, under the *Mermelstein* case, while it doesn't constitute a violation of 18, U.S.C., 1035(a)(2), it may, in fact, be relevant to a conspiracy to commit health care fraud charge.

Count 6, if I understand, is a count -- is a conspiracy to pay and receive kickbacks, which is -- which is obviously different than the health care fraud charge because, as Mr. Klugh pointed out, a conspiracy to pay kickbacks is not necessarily a conspiracy to commit health care fraud.

But I don't want to get too far afield on that point,

Your Honor --

**THE COURT:** Understood.

**MR. WAX:** -- because I think the Government even indicated, in response to your question whether it was about Count 6 or Count 19 -- I think the Government actually said that's the materiality of -- of failure to disclose, is that it would have resulted in a denial of the national provider identifier charge.

But be that as it may, Your Honor -- and, again, I think that the *Mermelstein* case is very illustrative.  It is a District Court case from the Eastern District of New York, but to the extent that it concludes -- and this is at -- at Page -- at Star Page 261:

"To the extent that Mermelstein concludes that the statements that he made to the Office of Professional Misconduct may have described the health care services that he provided to his patients, they clearly were not statements made in the course of delivering health care services or trying to get paid to do so."

And that involved the falsification of records by Mermelstein to the Office of Professional Misconduct.  And therefore, because of that, they were not, in and of themselves, violative of 1035(a)(2).

So it is an issue of statutory construction.  It really does not -- we're not arguing that it -- that it somehow should

be equated with a motion for summary judgment here or that it's an issue for trial.

It really does come down to the fact that the Government chose to charge, in Counts 19 and 21, that it was the -- the failure to disclose Jeremy Waxman's alleged ownership and management control of Active Assist as to Count 21 which formed the violation of 1035(a)(2).  And that simply does not fall within the scope of the statute.

And for those reasons, Your Honor, we would move to dismiss Count 21.

**THE COURT:**  Okay.

**MR. WAX:**  Thank you.

**THE COURT:**  Thank you, Mr. Wax.

**MR. CLOUSER:**  Thank you, Your Honor.

This argument does essentially boil down to a motion for Rule 29 that the Government has not proved that these actions were in connection with billing or material.

**THE COURT:**  Why is that a matter of -- why is that a jury question as opposed to a matter of construction?

**MR. CLOUSER:**  Because the indictment alleges that it is made in connection with the provision of -- or billing for health care, and the statute itself is different than the False Claims Act in important ways.  It provides that --

**THE COURT:**  I know, but I'm sorry.  I don't know that my question's answered --

**MR. CLOUSER:**  Sure.

**THE COURT:**  -- because the response very much travels on "This is a jury question."  But I am not sure, as I sit here, that I understand why.  There's just -- there's sort of just an assumption that this is a jury question, and we move on.  But I'm not sure that I understand your premise that it is.

It's a jury question -- the -- anything factual is a jury question.  Materiality may be a question -- a jury question.  Whether or not one of them, in fact, submitted or concealed or knew are all jury questions.

But I'm not sure that I understand how the Government answers the statutory construction question that a document in a -- a document that does not seek reimbursement at the time that it is submitted is in connection with billing.

**MR. CLOUSER:**  So it -- first, importantly, the statute does not say "only in connection with billing."  It's not a false claims statute.  It says that it has to be in connection with the delivery of, or payment for, health care benefits, items, or services.

And the enrollment form, the Form 855, is specifically in order to submit a claim for payment for health care services. That's the whole purpose of this document.  And the document, in several instances, lays that out.  Right up front, it says, "This is for billing privileges."  That's the purpose of this

document.

And it requires the provider to list -- a supplier must have at least one organization or individual owner, and the following individuals must be reported:  All persons who have a 5 percent or greater or indirect ownership interest in the supplier, all managing employees of the DMEPOS supplier, all individuals of the partnership interest in the supplier.

So they're required to provide that information.  The purpose of the information is for this enrollment document and for billing privileges.

And, in fact, the certification that the provider attests to states, "18, U.S.C., 1035 authorizes criminal penalties against individuals in any matter involving a health care benefit program who knowingly and willfully falsifies, conceals or covers up by any trick, scheme...or makes any materially false, fictitious statement and --

THE COURT:  Reading from?

MR. CLOUSER:  This is from the Form 855 itself.

THE COURT:  Okay.

MR. CLOUSER:  It lays out 1035 and then provides that the supplier knows that they have read and understand the penalties for falsifying information, as printed in this application, and that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication

supplying information to Medicare, or any deliberate alteration of any text in this application form may be punishable by criminal, civil, or administrative penalties, including, but not limited to, several things and/or imprisonment.

So this document itself lays out that it is, in fact, material and that the information that is provided must be true, or you could be subject to false statement charges under 1035 and other criminal penalties.

So that is in the document itself, and that is the basis for saying that it is made in connection with the provision or payment of health care services.

**THE COURT:** So you would agree that submitting a false statement -- 855S with a false statement --

**MR. CLOUSER:** Uh-huh.

**THE COURT:** -- completes the crime? It doesn't require submission of billing?

**MR. CLOUSER:** With a materially false statement, yes.

Now, in this case, the 855s that were at least by Dr. Alexander -- that he is charged with submitting in January 2019 -- they were billing at that time for -- to Medicare.

And so this is in connection with billing for a second reason, because they were, in fact, submitting claims sort of in part and parcel to this -- this January 2019 Form 855. But the answer is, yes, this enrollment document is made in

connection with the provision of, or payment for, health care services.

And so materially false statements made by the supplier or its authorized officials or owners of the DME supplier constitute, or are sufficient for, a 1035 charge.

So --

**THE COURT:**  So the defense is right, though.  This is the first that you're aware of that would seek to impose criminal liability for -- under 1035 for the submission of an 855S alone?

**MR. CLOUSER:**  No.

So we are aware of a case in which defendant pled guilty to conspiracy to violate 1035 by obscuring their own interest in a supplier.  That's *U.S. v. Pawlak*, which is Case Number 9:21-CR-80134, and that's 2021.  But I have not found any -- any Westlaw case that has addressed this situation directly in this district.

I do think that -- that the two cases cited in our opposition brief are instructive.  In fact -- and particularly the *Ary-Berry* case.  In that case, the charge related to a statement made in the -- in the enrollment documents, specifically that the -- the provider had a different specialty than they actually did.

And in that case, the -- the Court --

**THE COURT:**  May I ask you?

**MR. CLOUSER:**  I'm sorry.

**THE COURT:**  The citation in your brief to that case goes to the docket itself and not to any Westlaw opinion for the fact that her statement about her degree was made on the enrollment form.  The case itself, the published case on Westlaw --

**MR. CLOUSER:**  Uh-huh.

**THE COURT:**  -- doesn't mention that.  Is that -- am I right, or did I miss it?

**MR. CLOUSER:**  I think that's correct, Your Honor --

**THE COURT:**  Okay.

**MR. CLOUSER:**  -- and that dotted -- that docket entry is the indictment in that case.

**THE COURT:**  Okay.  So you don't know whether or not -- because there were other places where she had made that statement that the reviewing court relied on.

**MR. CLOUSER:**  Yeah.

So I -- we were, in fact, relying on the indictment and then the affirming of the conviction.  That's correct.

**THE COURT:**  I'm sorry.  I think I'm asking a different question.  I'm trying to compartmentalize.

**MR. CLOUSER:**  Uh-huh.

**THE COURT:**  You're aware that the indictment charged her with making the material false statement pertaining to her license in the indictment.

But when I read the Westlaw citation, the reviewing court seemed to rely on evidence that her submissions for reimbursement also identified -- that's where it identified her as the licensed physical therapist, thus making her eligible for a higher rate of pay.

**MR. CLOUSER:** Through her provider identifying number, right. And so that's the -- that's the connection, right.

**THE COURT:** Which she only gets because she submitted the enrollment form identifying herself as the licensed therapist?

**MR. CLOUSER:** Correct.

So --

**THE COURT:** Okay.

**MR. CLOUSER:** So that's the connection.

So she submits a form that says she's one thing. That form results in a provider identifying number, and that number is associated with her new specialty -- or with that false specialty. And so the claims are incorrect because they are referencing back that false specialty.

And it is true, as -- you know, the defense points out that the connection there is that the false specialty allowed billing for a higher rate and for different services. But the -- the fundamental point is a false statement in an enrollment document is material to, and made in connection with, the provision or payment for health care services as --

you know, because it allows you to bill Medicare for those services.

So I think the final point is just that the -- the indictment tracks the statutory language, provides the essential elements of the -- the crime charged, and satisfies all of the Rule 7 and constitutional requirements.

And any dispute about whether the evidence shows that this is material or in connection with billing and payment or the provision of health care services goes to a factual issue. That is a question for the jury and is not appropriate for a motion to dismiss.

And so the Government would ask that the Court deny the defendants' motion to dismiss.

**THE COURT:**  Okay.

**MR. CLOUSER:**  Thank you.

**THE COURT:**  Thank you.

**MR. KLUGH:**  Your Honor, I want to address first the Government's argument that -- that the form settles the law or creates law by referencing a whole litany of various false statement offenses that potentially could be involved in making a false statement regarding Medicare.

And I think it lists -- I don't know -- seven or eight different statutes that the form -- and we don't even know exactly who's responsible for the form.  If, for any reason, the Court were considering relying on that form as the

statement of the law, I think, as my counsel -- co-counsel Barry Wax points out, the *Chevron* doctrine would certainly bar that.

If they're -- if they're arguing that the agency has determined the scope of 1035 in some way because it appears, on a form, that that's one of the statutes that could be violated, that -- I don't think that works under *Chevron* and --

**THE COURT:**  I'll tell you, Mr. Klugh, I don't disagree with you at all.  Like, it doesn't -- it doesn't form an offense because the form told us to, but it does -- I understood that to be a response to the notice argument.

**MR. KLUGH:**  To the notice --

**THE COURT:**  The defendants couldn't have known that this conduct exposed them to criminal liability.

**MR. KLUGH:**  Right, and my response to that is -- is that, again, it's sort of a -- similar to the one I try to make in a government-entrapment-by-estoppel argument against the Government.  It doesn't work, for due process purposes, for the Government to misadvise you on the law and then, you know, for -- for you to either accept or not to accept that misadvice.

Where it appears on this form, I don't --

**THE COURT:**  If it's misadvice, you've won on a different ground.

**MR. KLUGH:**  That's true.  That's true if it were

misadvice, and I think it is misadvice, but it's -- it's unclear exactly where this appears on the electronic application.

We have no -- this whole concept of electronic and actual is really still a little bit unclear.  It's -- in any event, the fact that the Government can't cite any case law and is relying on its own agency's attempt to stretch the law is a sign that the motion should be granted.

The -- the *Pawlak* case, I think, that the Government cites today is probably the most important reason why the Court should dismiss this case.  A defendant pled guilty.  A defendant pled guilty because, again, faced with a charge that -- even represented by counsel, people are going to be, you know, pleading guilty to things that are not crimes.

And it's really a tragic part of -- of -- of the practice that -- and why it is so important to deal with these things on the basis -- the facial basis of the construction of the statute.

The Government has acknowledged that it believes that the form is -- violates the statute, even if no additional billing is contemplated, whether or not any additional billing is contemplated, and whether -- whether there's any -- any relationship, in the mind of the defendant even, to the submission of this -- of any form and -- and billing.

The -- the -- the extent to which the *Ary-Berry* court went

into the specifics of the relationship to billing -- and if that is the case -- again, to me, the *Pawlak* case is a tragedy case, not a case that advances.  But the other case they cite, the *Ary-Berry* case -- that is the case, again, like *Melgen* in the Eleventh Circuit, where they -- they say you at least have to very specifically link it to billing.

And I was trying to think -- there's a political issue that's been, you know, for my life, most -- possibly the single most important political issue in my life having to do with -- they use the term "delivery."

But suppose you have an abortion statute in Florida that says anybody who makes a false statement in connection with stopping the delivery or obtaining payment for stopping the delivery of -- of a potential baby is -- is guilty of abortion.

And the false statement is a doctor applies, you know, to -- to a hospital that permits reproductive health and -- and makes a false statement about his qualifications.  So, you know, no, that's -- it's talking about a false statement in connection with the failure to deliver or the failure to obtain payment or the obtaining of payment.

I mean, you can't -- the -- it's a -- it's a baloney-slicing thing that the Government's doing.  You can't turn one into the other.  If a -- if a statement is not made in connection with the delivery of services and a statement is not made in connection with the payment for services, then what is

the statutory language -- how in the world can the statutory language apply?

It's not fair to people.  There certainly is no notice. The form does not create a notice under Supreme Court precedent at all.  The fact that a policeman warns you not to -- not to walk down the sidewalk does not mean that it's okay to prosecute you for walking down the sidewalk on a jaywalking statute.  It simply is not that -- that's not how notice works under *Bouie v. City of Columbia*.

This is a fundamentally problematic and novel use.  The Court should stop this application -- this use of the statute. It is extraordinarily thin from an evidentiary standpoint, but there's no reason why we should have a trial on something that the statute does not apply to, Your Honor.

**THE COURT:**  Okay.  Thank you, Mr. Klugh.

**MR. WAX:**  Judge, I have no additional information to provide by way of rebuttal here.  I would adopt Mr. Klugh's arguments.

**THE COURT:**  I appreciate it.

Since you're already on your feet, do you want to take up where we left off with your discovery issue on -- the last time we were together?

**MR. WAX:**  Judge, I -- I have not received any correspondence or any communication from the Government about anything that they have done subsequent to the hearing --

THE COURT: Okay.

MR. WAX: -- with respect to the review of those files. So I would ask that be queried of the Government at this time.

THE COURT: All right.

MR. CLOUSER: And, Your Honor, we're prepared to provide an update.

THE COURT: Go ahead.

MR. CLOUSER: So since our last discovery conference, we have produced now the enrollment documents as to Active Assist, as we agreed to do, similar to Silent Hill.

THE COURT: Great.

MR. CLOUSER: We've also -- the prosecution team has reviewed the -- the grand jury transcript in this matter and confirmed that there were no statements or discussions about the form of the signature that -- as requested by Dr. Alexander's counsel.

So there's nothing in that grand jury transcript that is relevant to that discussion and needs to be turned over.

THE COURT: Forgive me for asking you to clarify, but that means that, if memory serves, the grand jury was not told that Dr. Alexander, in fact, put pen to paper and signed the application.

Is that accurate?

MR. CLOUSER: That is accurate.

THE COURT:  Okay.

MR. CLOUSER:  And then with respect to the -- with Dr. Zusmer's motion to compel in the Middle District of Florida, the prosecution team has reached out to the prosecutors' office in the Middle District of Florida U.S. Attorney's Office and the prosecutors therein, and they have confirmed that there is no closeout memo.

And the decision was not -- to transfer the case to the Middle -- or the Southern District of Florida and the Department of Justice was not based on any *Brady* or other producible information.

So we've -- we've conducted the inquiry that was requested.

THE COURT:  Mr. Wax, do you have any follow-up questions?

MR. WAX:  Your Honor, give me just a moment.

I do acknowledge, though, they did provide me with the enrollment documents, the 855S, in its totality.  So we do have that.  Give me just a second to consider this, Your Honor.

MR. CLOUSER:  And --

MR. WAX:  Judge, the -- I -- let me come to the podium.

THE COURT:  Okay.

MR. WAX:  Is it okay from here?

THE COURT:  It's fine as long as --

**MR. WAX:**  Can you hear me fine?

All right.  So it still begs the question of why the money was returned.  That's really the heart -- at the heart of what our motion asked for, which is you seized $154,000 from the account of Active Assist ostensibly on the grounds that it was the proceeds of illegal activity.

There's -- no -- no documents have been provided whatsoever by the Government, and we talked about this in the oral argument, about how it was seized.  You know, you can't just call a bank, even if you're a federal agent, and say, "We want this money."

There has to be some document, whether it's a seizure warrant or -- or a -- something that says, "We are entitled to take this money out of the bank," and that would establish the basis for the initial seizure.  And then we get to the point where the Government turns around, you know, several months -- almost a year later, and says, "Here, we're giving you the money back."

It doesn't compute.  That's what I'm getting at now. They've represented this is what the prosecutors in the Middle District have said, but it -- it doesn't compute.  It doesn't add up.  I have a very healthy skepticism, based on past experience in forfeiture proceedings, about the Government just turning around and re- -- and giving it back.

If you recall, Your Honor, in Dr. Zusmer's statement of

claim that's part of our -- I attached it to the reply to the Government's response to the motion to compel specific *Brady* evidence -- he makes an exculpatory statement about the proceeds of this money being the result of completely legitimate activity because that was his belief.  And it continues to be his belief, from his perspective, about what he knew about this alleged conspiracy that he's supposedly a part of.

So there's a part of the defense here that says, "Did the Government accept what he said?"  Why just turn around and give the money back while there's a target letter against him that's pending, while there's a grand jury subpoena for production of documents that has been responded to already?  Documents were produced in April of 2020, and the money was returned after those documents were produced.

So I -- I'm not satisfied just with the representation of the Middle District of Florida prosecutor.  I had asked for an in-camera review by the Court, and I still think that that's something --

**THE COURT:**  But an in-camera review of what?  They just said there isn't one.

**MR. WAX:**  But they're saying there's not a closeout memo, but there still is a file.

Now, the Government made a distinction in their response between opinion work product, which the case law seems to

indicate is not discoverable except in very limited circumstances where the facts -- exculpatory facts may be blended with the opinion, or the production of specifically work product in the nature of facts that were uncovered without reference to the opinion of the attorney.

In order to return $154,000 that was seized ostensibly as the product of illegal activity, one would surmise or expect that there would be some exculpatory facts.  That's really what I'm getting at, and we're entitled to those exculpatory facts.

THE COURT:  Then --

MR. WAX:  If, later, the Government determined that those exculpatory facts maybe were overcome by other evidence they uncovered, that's a separate issue.

THE COURT:  Mr. Wax, one of the -- I struggle with this because the seizure, the forfeiture, occurred in a different investigation and identified a different defendant -- I've just forgotten her name.

MR. WAX:  Kelly Wolfe.

THE COURT:  I knew "Kelly."  I couldn't remember the rest of it.

MR. WAX:  Yeah.

THE COURT:  -- as the defendant -- as the person who committed the fraud there.  But by the time it was effectuated, the account had changed ownership and control.

It -- I guess the reason that I struggle with the argument

is that it seems so logical to me that if the Government goes after one person's money and finds out that it's not the person's money who they tried to get, I would hope that we'd be a little offended if they said, "I get that we were wrong. We're keeping it anyway."

MR. WAX: Well, I understand that position, Judge, but understand that I've never been provided with the actual seizure warrant because the administrative forfeiture proceeding was obviously dismissed. I had -- we had elected the right to have the Government file a complaint in -- in court --

THE COURT: Right.

MR. WAX: -- you know, and we were going to proceed under that election of rights. And by deciding not to proceed, the Government short-circuited any discovery that we could have engaged in to find out why.

Now, when I prepared the motion for production of specific *Brady*, I -- I assumed I had to represent to the Court that it was, in fact, part and parcel of United States of America versus Kelly Wolfe, et al.

I still don't know specifically if that's the case. Okay? It -- you know, I -- my representation about that case, even at oral argument, was I have to believe that that was the reason why because we've seen nothing different.

So at a minimum, Judge, what I would request at this point

is a copy of the seizure warrant and affidavit upon which the seizure was predicated, whether it's specific to Kelly Wolfe or specific to Dean Zusmer, because if what you just said is the case, where the Government wrongfully seized the money, thinking that it was Kelly Wolfe's money, then that would put an end to the whole thing.  But we still don't know that to be the case.

So I think that it's reason- -- it's not a difficult ask if we're seeking to discover if there were any exculpatory facts and whether perhaps that's admissible in a trial of this conspiracy to commit health care fraud charge, that, at a minimum, asking for the seizure warrant and affidavit or even an in-camera review by this Court of the seizure warrant and affidavit is not unduly burdensome.

**THE COURT:**  What would I be looking for, just to confirm that it was directed to Kelly Wolfe's conduct?

**MR. WAX:**  I would say that you would be looking -- you would be looking for initially -- is did the Government make a mistake and say that this account belonged to Kelly Wolfe, and Dean Zusmer is not mentioned in the seizure warrant affidavit, or was he mentioned in the seizure -- seizure warrant affidavit, and were there inculpatory facts that were erroneous --

**THE COURT:**  Ah.

**MR. WAX:**  -- okay? -- about Dean Zusmer?

What did the Government represent at that time? Because we know that in April of 2018, by virtue of the -- the -- the interview, the memorandum of interview, the reports of investigation that we've been provided -- that in April of 2018, Kelly Wolfe was -- was interviewed by the Government.

And this was prior to the filing of the ex parte complaint and the seizure of the funds.

THE COURT: Okay.

MR. WAX: Judge, one moment.

Judge, can I defer to Mr. Quintero? He's just brought something to my attention that I think he could articulate a lot better than I can, and perhaps that might be important to the resolution of this.

THE COURT: As long as he uses a microphone.

MR. QUINTERO: Thank you, Your Honor.

I was just pointing out to Mr. Wax that if the seizing agency in the Middle District was HHS-OIG -- and I know this because I finished a -- two cases with them that were dismissed by Judge Cooke, one in 2021 and one in 2022.

The HHS-OIG -- that agency uses what is called the IRIS database. That is a national database that is strictly limited to HHS-OIG. All their cases go in there. You -- you punch in a suspect's name. It gives you everything on that individual, who has open cases against that individual, what cases are pending, and so on and so forth. Every agency has a

different -- a database like that.  DEA uses NADDIS.

So there has to be -- if the seizing agency on that money was HHS-OIG, there has to be a companion log entry within that agency's IRIS database as to what happened with that money, why was it returned, who handled the money, who was the agent that -- that directed the seizure.  All that information would be there.

So the fact that there may not be a closeout memo from the Middle District U.S. Attorney's Office does not mean that there's not a closeout memorandum or some form of documentation within that IRIS database by HHS-OIG.

I'm simply pointing it out because the fact that there may not be anything at the U.S. Attorney's Office does not mean that the seizing agency wouldn't have some documentation to protect themselves from either returning the money or what they did with the money and so on and so forth.

So it may be a good idea to ask the Government to turn over that information either to Mr. Wax or to the Court for in camera.

**THE COURT:**  That's helpful, Mr. Quintero.

Thank you.

**MR. WAX:**  Thank you, Your Honor.

Nothing further.

**THE COURT:**  Okay.

**MR. CLOUSER:**  Thank you, Your Honor.

So the basis of the decision not -- to return the money is privileged work product, and what we've done is we've confirmed that it isn't based on the -- any *Brady* information, and it's -- it's not based on an acceptance of Mr. Zusmer's allegedly exculpatory statement.  In fact, that statement was turned over to the defense in one of the -- our first productions.

And the -- the decision by the Middle District of Florida to return the money -- and it would have been by the -- the forfeiture attorneys in that district -- was not based on any -- we have been told that it was not based on any *Brady* information and that it was a -- based on a -- the basis of the decision was for other reasons that are privileged opinion work product.

With respect to the seizure warrant, we can get and provide the seizure warrant itself.  It was sealed at the time. So we'll have to confirm that it is either unsealed or move to produce it, which we are willing to do, and we'll make that available.

THE COURT:  Did you say the seizure warrant and the affidavit?

MR. CLOUSER:  Yes, so the seizure warrant and the affidavit.

THE COURT:  How much time do you need to accomplish that if you were to move to unseal today?

**MR. CLOUSER:** So Monday is a holiday.  So I think, if we were going to do that, we can do so next week.  I expect that -- it may very well be unsealed at this point.  We just -- I have not confirmed that.

So we'll confirm that and then get a copy to the defense if it is unsealed; and if it is not unsealed, we'll file a motion to produce Tuesday.

**THE COURT:** Okay.  Motion -- most motions to unseal can be a page or two.

**MR. CLOUSER:** Yeah.  Yeah.  No.

**THE COURT:** If you can get that filed today, I know that that will help.  You did not get the continuance you sought, and so I would ask that you try to get it on file today, if you need to.

**MR. CLOUSER:** Okay.

**THE COURT:** There's three of you.

**MR. CLOUSER:** Yeah.  Sure.  Understood.

With respect to the seizing agency, I actually don't know which agency seized the -- the document -- or sorry -- seized the funds.  I do know that the decision to release the funds was made by the Middle District of Florida's U.S. Attorney's Office.

**THE COURT:** Right, but to Mr. Quintero's point, the agency has the money.  The agency has to return the money.  So whoever returned the money, in all likelihood, may have a log

that indicates -- one would hope that when you have abandoned $150,000, you make a note of it.

So to Mr. Quintero's point, I think it is worth, considering how much energy has already been expended on this, investigating -- determining if the returning agency contains non-privileged information.

If the AUSA called and said, "I have made the decision," and the log conveys and only memorializes that attorney's opinion work product, it's not going to be discoverable.

**MR. CLOUSER:**  Uh-huh.

**THE COURT:**  But it is worth a phone call.  Before we say, "I can't turn it over," let's find out what the "it" in the room is.

**MR. CLOUSER:**  Sure --

**THE COURT:**  Okay.

**MR. CLOUSER:**  -- and we can do that.

To be clear, I -- I'm not sure that it was HHS.  I --

**THE COURT:**  You said so.

**MR. CLOUSER:**  My hope and belief is that the FBI was -- executed the seizure warrant.  So it may be FBI.  We will inquire.

**THE COURT:**  Okay.

**MR. CLOUSER:**  If there's no other questions, I can return to my seat.

**THE COURT:**  I -- I don't think there were, but let me

just look.

Okay.  Okay.  No other questions.

The -- Mr. Wax, they're going to get you a copy of the warrant.  They're going to investigate whether or not the seizing and releasing agency kept a log and what its contents, if any, are.

**MR. WAX:**  Great.  That's a step in the right direction, Judge.

I believe the seizing agency -- it may have been the FBI.  I was just looking on my database for the -- the actual --

**THE COURT:**  Do you agree?

**MR. WAX:**  Yeah.

-- actual -- I was looking on my database for the -- the seize -- the notice of seizure, and I'll share that with the Government after the hearing and let them know who the seizing agency is.

**MR. CLOUSER:**  Thank you.

**THE COURT:**  Okay.

**MR. WAX:**  Okay.  You're welcome.

**THE COURT:**  Okay.  I think the only thing that remains at issue is your motion for an extension of time on Mr. Waxman's -- Waxman's phone.

**MR. CLOUSER:**  Yes, Your Honor.

**THE COURT:**  Can I be candid that telling me the size of that entire phone made my heart drop?  Because it felt like

nobody heard me the last time we were here, when I said, "Pull out the parts that are relevant."

What's going on?

MR. CLOUSER:  So -- yes, Your Honor.

So let me start --

THE COURT:  I guess I should also ask, Mr. Quintero, Mr. Quinon, whether you've adopted and stepped into the shoes of the request for some, I think, 33 people in the correspondence chain.  Is that where you are with -- Mr. Klugh's nodding.  I forgot there's continuity.

Okay.  So -- sorry.  I mean, does that --

MR. CLOUSER:  So --

THE COURT:  It didn't seem, from your motion, entirely attributable to 33 text exchanges.

MR. CLOUSER:  I think it's 36 individuals, and --

THE COURT:  Okay.

MR. CLOUSER:  -- and so what we have done -- there are sort of two tracks here.

To be very clear, we are not reviewing -- and there's not -- the issue of size is not related to irrelevant application data, you know, downloaded movies, things like that.  The size issue just affects how easy it is and the processing time to actually move the data from one, you know, device to another in order to do a filtering process.

What the process is, as laid out in our motion -- and I

will turn it over to Joanna Bowman, who is our filter attorney --

THE COURT:  Oh.  That's right.

MR. CLOUSER:  -- who's actually doing this, in just a moment.

But my understanding of the process is that, with the consent of Mr. Waxman's counsel, he has provided a list of search terms that he said -- those will result in potentially privileged material, and the filter team is running them against the data -- the extracted data -- the extracted text data from the phone.

And the plan is to produce all of the material that does not hit on those search terms as quickly as possible.

THE COURT:  Well, Ms. Bowman, I don't -- well, actually, I don't think -- I don't -- I don't quite understand why we get to a filter team issue.

The 36 people who the defense has identified, which -- I understood you just want the text strings between Mr. Waxman and these people; is that right?

Mr. Quintero's nodding.

MR. KLUGH:  Or WhatsApp or --

THE COURT:  Right.  Right.

MR. CLOUSER:  So --

THE COURT:  I'm generically saying communications on the phone between -- they're inherently not privileged.

Why is the filter team involved?

**MR. CLOUSER:** So of the 36 people, three of them are -- two of them are attorneys.

**THE COURT:** Okay.

**MR. CLOUSER:** One of them is Mr. Waxman's wife.

So for them, there will be -- there are clear privilege issues. And for the other remaining individuals, even a communication among people who are coconspirators may be privileged as to outside individuals because they could share a joint privilege.

And Ms. Bowman can speak to this more directly, but there may be communications involving Waxman and one of the identified individuals --

**THE COURT:** Which one?

**MR. CLOUSER:** -- that talk about legal advice that they both received.

And so --

**THE COURT:** Why isn't it -- wait. Hold up. Let's get -- let's get granular.

Who are the individuals -- so we've got -- we've got a lawyer. They asked for communications with the lawyer? Which lawyer?

**MR. CLOUSER:** Sorry.

Allow me to turn this over to Joanna Bowman since I'm not able to review and -- and be part of --

THE COURT:  But I thought Ms. Bowman was filter.

MR. CLOUSER:  She is, and so she could answer which people that -- based on her discussions with Waxman's counsel.

THE COURT:  Ms. Bowman --

MS. BOWMAN:  Yes, Your Honor.

So as to --

THE COURT:  -- out of the 30- -- I'm sorry.  I know that you're not in the courtroom.  So this is going to get a little bit harder.

But I'm going to pepper you with a couple of questions and then let you fill in the gaps.  Okay?

MS. BOWMAN:  Sure.

THE COURT:  So starting with -- there's 36 persons that the defense team has asked.

First question:  Do all 36 people have text or WhatsApp chains on Mr. Waxman's phone?

MS. BOWMAN:  We have a team of reviewers who are going through that currently.  So I can't answer -- I don't know the answer for that -- to that question at this time.

We think --

THE COURT:  And hold up.  Just hold up for a split second --

MS. BOWMAN:  Sure.

THE COURT:  -- because, holding a phone in your hand, you could answer that.  You just -- you just literally go to

the search function.  You put their name in.

We should know whether or not all 36 actually had text exchanges with Mr. Waxman.  Does anyone know?

Nobody knows.

We're going to find that out, like, right off the bat because part of the motion for extension of time traveled on the premise that the defense has asked for a lot.  But if we don't even know that it's there, then that's not a basis for needing more time.

So, Ms. Bowman, the next question I have is:  There is a person, of the 36, who's identified as a lawyer.  What is that person's name?

**MS. BOWMAN:**  There are two, Lee Lazarus and Robyn Sztyndor.

**THE COURT:**  I'm not hearing Ms. Bowman say the name.  Do either of you know it?

**MS. DE BOER:**  Yes.

Lee Lazarus and Robyn Sztyndor.

**THE COURT:**  Okay.  Lazarus and -- last name?

**MS. DE BOER:**  Sztyndor.

**THE COURT:**  Sztyndor.

**MS. DE BOER:**  S-z-t-y-n-d-o-r, I believe.

**THE COURT:**  Okay.  All right.  Both of these people represented Waxman in -- in what capacity?  Does anybody know?

Okay.

**MS. DE BOER:**  Ms. Bowman may know through -- through conversations with Mr. Waxman's counsel.

**THE COURT:**  Ms. Bowman?

**MS. BOWMAN:**  I don't know exactly in what capacity, but those were names -- Mr. Waxman provided a list of attorney names and certain identifiers, email addresses and phone numbers.

And those are the limited terms we're applying across the phone to expedite the release of this material to the defendants and the prosecution team.

**THE COURT:**  Ms. Bowman --

**MS. BOWMAN:**  We would still need --

**THE COURT:**  Ms. Bowman, can I have you freeze there?

**MS. BOWMAN:**  Yes.

**THE COURT:**  To the defense team, did you ask for Lazarus and Sztyndor?

**MR. KLUGH:**  Yes, Your Honor.  The name Lazarus has come up as having given legal advice to corporate entities.

I'm not sure what privilege is being asserted -- oh.  I'm sorry.  I'm not sure what privilege is being asserted.  It's my understanding that the communications were to corporate entities in relation to corporate entities.  So I'm not sure what Mr. Waxman's counsel is stating.

Sztyndor -- I'm not a hundred percent sure with regard to Sztyndor's situation.

THE COURT:  Okay.  But they are custodians or -- I'm calling them "custodians," but these are two people for whom you have sought the text exchanges?

MR. KLUGH:  Yes, Your Honor.

THE COURT:  And, Ms. Bowman, you -- as you sit here, you don't know whether or not he has chains of communication with Lazarus or Sztyndor?  You just use them as generic search terms across all the data?

MS. BOWMAN:  We did identify terms with those individuals as well as with his wife.

THE COURT:  Sorry.  I'm not understanding your answer. Did you identify that there are strings of text messaging with these two individuals as opposed to did you just run their names across all data and got hits?

MS. BOWMAN:  There -- we believe there are text messages, and we believe there are also email communications.

THE COURT:  So -- so I'm having trouble contextualizing that answer.  This has been going on for at least a few weeks.  I don't know what you mean by "We believe."

MS. BOWMAN:  We have identified emails with those individuals as well as text communications.

THE COURT:  Okay.  All right.  I'm going to put --

MS. BOWMAN:  (Inaudible) the phone since Monday.  I want to -- I do want to preface that.  We have not had access to the phone prior to that time.

THE COURT:  Okay.  What are the other privileges?  You said the wife?  Are there any other --

MS. BOWMAN:  Yes.

THE COURT:  -- presumptively, at least at this point, privileged persons that are on the list from the defense, Ms. Bowman?

MS. BOWMAN:  Not that we are aware of.  However, I do have a team of -- of reviewers who are searching for those communications with those 36 individuals --

THE COURT:  What does that mean?

MS. BOWMAN:  -- and --

THE COURT:  Wait.

I'm sorry, Ms. Bowman.  Again, I'm just having trouble figuring out -- my question was:  Are there any other privileged persons?

MS. BOWMAN:  There are no other privileged persons on the -- on the list.  Those are the three that we've identified --

THE COURT:  Okay.

MS. BOWMAN:  -- that Mr. Waxman has identified for us, yes.

THE COURT:  Okay.  It seems to me that -- I want to make sure that I understand the argument here.

As to the other 33 persons that the defense has asked whether or not Waxman communicated with, there is a privilege

asserted by Waxman with respect to some of those 33 people.  Is that -- am I understanding this correctly?

MS. BOWMAN:  So there may be communications among some of those people with attorneys that Mr. Waxman has identified as -- as terms that he wants to -- as parties with whom he has a privileged relationship.

So he may have a communication with another individual, and they -- those two individuals may have a communication with an attorney that Mr. Waxman has identified as a (Inaudible) he seeks to have a privileged relationship with.

THE COURT:  So I'm trying to figure out how that works.

I'm going to just pick the name John Smith.  If John -- if Mr. Waxman says, "I may have communicated with John Smith and an attorney," am I -- am I correctly suggesting so far how Mr. Waxman has put this out to you?

MS. BOWMAN:  It's -- it's -- sort of.

We -- we negotiated a terms list with Mr. Waxman because we thought it was the fastest way to get through the phone and turn over the phone as quickly as possible so there's no -- no question that we are inadvertently not finding the text chains that the defendants are looking for or -- or we're overlooking something that the defendants are seeking.

THE COURT:  Okay.  Well, I want this to be done in a different way.

I want identification -- if by Waxman, that's fine.  He is the privilege holder, but I want someone to specifically identify to me the purported privilege.

In this posture, other than Lazarus, Sztyndor, and the wife, you're talking about a joint defense privilege?  Am I right?

**MS. BOWMAN:**  Potentially.  We -- you know, we don't know for sure.  We're not -- we're trying to expedite this review and -- and release everything we can to the defendants as quickly as possible.

**THE COURT:**  I hear you.

I've got to move you off of the concept of "release everything that we can."  The phone is enormous.  I asked, and am reiterating the order, that the text message strings that are presumptively not privileged be extracted and turned over, which is what we discussed at the last hearing.

And so of the 33 other custodians, it's not my expectation that the filter team is running searches over all of that data -- right? -- or it is, without consideration for who the person was and whether or not it could plausibly have -- that person could plausibly have a joint defense with Mr. Waxman?

**MS. BOWMAN:**  We have been, too, tracking this.  We have been applying the terms across the phone generically -- or the -- provided from Mr. Waxman the limited terms he's provided across the phone.  And we also have a team of people trying to

isolate the communications with those -- those identified individuals, and then we are running the privilege terms over that material --

THE COURT:  Okay.

MS. BOWMAN:  -- to make sure that we're not -- we're not inadvertently releasing something that may have a string with an attorney.

THE COURT:  No.  This snowballed.

So the -- the request started with "Mr. Waxman's phone has been turned over to the Government for limited consent to pull a couple of text strings.  We think that's incomplete.  We want the rest of the text strings."  I asked you to seek permission from Waxman to make a forensic copy so that there couldn't be any concern about deletion, modification, or destruction.

The defense has, per my order, provided a list of names that fall into the category of really what they had raised at the hearing, meaning if you're going to pull these names, you've got to also pull these names and his communications with those persons because that's where we suspect the *Brady* material lives, the rest of the story lives.

The -- the -- there is no -- neither time nor, as far as I can tell, an appropriate scope for us to be, at this point, searching that entire telephone as though discovery is starting in this case.  What was intended, what I'm instructing you to do, and what I swear I said last time, is to start with the --

where there could be no privilege, pull it.  Turn it over.

If Waxman's asserting a joint defense privilege with anyone, like any other privilege-holder, under Local Rule 26.1, he has got to be able to articulate it.  It's not just a matter of, like, "And then we talked about the attorney."  That's not privilege.

Okay.  The involvement of the privilege team -- I -- I tremendously respect the work that everyone is doing to be cautious, but I'm not sure that it is smart, meaning I don't think that you're approaching this in a way that makes any type of sense.  And that's my main concern.

Mr. Wax?

**MR. WAX:**  Your Honor, it just occurred to me -- and it didn't occur to me in the last hearings about this.  But if Mr. Waxman is claiming privilege, and you just said he's got to articulate it, I'm not quite certain how he would be able to overcome a potential crime-fraud exception or the fact that his claim of privilege may be in violation of his plea agreement.

**THE COURT:**  I don't know.  It's incredibly fact-specific, and I certainly won't be able to resolve it here.

The point is not so much whether or not, at this posture, the privilege can be recognized but, rather, how we are going about looking for the presumptively non-privileged material first --

**MR. WAX:**  I agree.

**THE COURT:**  -- so that it can be turned over.

**MR. WAX:**  I agree.

And perhaps, to expedite this process, it might be beneficial or -- or incumbent on the Government to reach out to Mr. Waxman's lawyer and say, "Hey, how are you" -- "why are you claiming privilege in light of the fact that he's admitted to all these crimes and potentially used the attorneys to facilitate his crimes and/or your plea agreement says you've got to turn over everything?"

And maybe that will short-circuit the whole involvement of the privilege team.

**THE COURT:**  So to be clear, he did turn over everything.  So I don't want to --

**MR. WAX:**  Oh, I know that.  I -- right.

**THE COURT:**  I don't want to, again, mix issues.  I just want the discovery to turn -- to be turned over, and I don't want the filter team spending two weeks looking for something that they never had to look for, is really what I'm trying to shortcut.

I appreciate it.  I understand where you're headed.  We're just not there.  We've got to start with, again -- and I'm just trying to decide, now that it's Friday --

**MR. WAX:**  Sure.

**THE COURT:**  And what has been turned over from the

phone?

MR. CLOUSER:  So to date, the two text strings that we produced with Mr. Waxman and the defendants has been turned over.

THE COURT:  Okay.

MR. CLOUSER:  We have not --

THE COURT:  That was done some time ago --

MR. CLOUSER:  That was -- yes.

THE COURT:  -- if memory serves.

MR. CLOUSER:  I think between the first two discovery conferences, that was done.

THE COURT:  Who are the persons -- does anyone in the courtroom or on the phone know who are the persons that Mr. Waxman has identified as potentially having a joint defense privilege with?

MS. BOWMAN:  He has not identified anyone specifically at this point.  He's -- and I -- let me just let Your Honor know that we have basically finalized our review of those initial search terms that Mr. Waxman did provide, and so we are in the position of -- of making a copy of this phone and sending it back to the analyst over the weekend.

We're not going to be reviewing the phone any further for these privilege terms.  However, we will continue to review this phone to identify those various communications with those 33 parties to see if we can extract those and get those out

sooner to the defendants.

THE COURT:  Okay.

MS. BOWMAN:  So we -- we are done with our -- our review of the -- of the phone in total.  We're not -- this is not a phone we're spending weeks and weeks on that we would ordinarily be doing.

We are -- we have run the terms, and we are -- we are done.  We are making a copy of it, and we're going to send it back to the analyst over the weekend.

THE COURT:  Thank you, Ms. Bowman, but I still don't understand the workflow.

If you're running privilege terms over the communications with persons that Mr. Waxman could not have a joint defense privilege with, then that's just a tremendous waste of time.  There's no -- it starts with the relationship.  So I don't -- I don't understand what's -- what's happening, and I don't know that anyone in the room has the information.

Mr. Quinon?

MR. QUINON:  Judge, I -- I haven't really interjected much, but I just --

THE COURT:  Anything.

MR. QUINON:  Maybe I'm crazy.

(Laughter.)

MR. QUINON:  Maybe I'm not understanding this, but I thought I understood the prosecutor, when he got up first, to

say that all they were going to do was take the three

individuals who may have a privilege, the two lawyers and the

wife, and take whatever documentation relates to that, put it

aside, and immediately they were going to give us the rest of

the stuff, the rest of what's on that phone.

That's what I understood the prosecutor said.

**THE COURT:**  Do you want the rest of the phone, or do

you want the text mess- --

**MR. QUINON:**  No.  No.

**THE COURT:**  So I just want to be, again, clear because

there's -- there's simultaneous -- I'm trying to prevent the

situation where you're getting a needle in a haystack.  I am

trying to get you the text messages --

**MR. QUINON:**  Right.

**THE COURT:**   -- that you asked for.

**MR. QUINON:**  That's -- that's what I understood that

they were going to do, put the text messages and the emails

that could be privileged and give it to the filter team --

okay? -- and then the rest of the text messages and the emails

would be given to us.

**THE COURT:**  Right, and --

**MR. QUINON:**  That's it.

**THE COURT:**   -- so you were -- I thought we were on

board, too, until I heard that the filter team is also running

privilege terms identified by Mr. Waxman on all 33 people.

MR. QUINON:  That's not what I understood.  I understood they would run it in the whole thing and then pick up the three that their search -- their initial search, with the search terms, would pick up only the lawyers and the -- and the wife, and that would be turned over to the filter team, and the rest of the doc- -- the rest of the emails and texts would be given to the defense.

MR. CLOUSER:  So -- so that's not exactly right.

So the filter team and Mr. Waxman's counsel have agreed on a set of terms that will result in potentially privileged information.  And what the filter team has done is run those terms across all the data, pull that material out, and is going -- and we are going to be in a position shortly to produce the remainder of the phone.

Now, that production will be in --

THE COURT:  When you say "the remainder of the phone" --

MR. CLOUSER:  Uh-huh.

THE COURT:  -- can we make sure we're using the same terminology?  You're referring to the remainder of the data from the 33?

MR. CLOUSER:  Yes, and so let me --

THE COURT:  There's no expectation --

MR. CLOUSER:  No.  I'm sorry.

THE COURT:  -- of you producing the entire phone;

right?

MR. CLOUSER:  No, no, no.  We would produce the remainder of the phone, and -- but to be clear, the -- the way it will be produced will be in such a way that they can identify and review the 33 they want.

Our concern has -- is that, you know, the whole phone is in our possession.  And if other parts of the phone become material to the defense or relevant to the defense, we don't want to have withheld that and then find out at trial, "Oh, there's" -- you know, "There's this other person that they want."

So --

THE COURT:  Pause for a split second.

MR. CLOUSER:  Sure.

THE COURT:  Let me ask for -- on behalf of each of the two defendants, do you want them to produce an entire copy of the phone, or do you want it available for inspection in the event that you want to go look at it?

Just think about that for a moment because my inclination is to require production of the text or WhatsApp messages.

MR. CLOUSER:  It -- I -- I think, from our perspective, we would need approval not to produce the entire phone that's in our possession, to the extent it's not privileged, from our supervisors.

So if that's the -- the approach that is agreed on, we

would have to go back and confirm that we can, in fact --

THE COURT:  Okay.  I am still not sure who or how the decision was made to run privilege terms across data for which there is no presumptive privilege with those persons.  That seems like it just inherently -- I don't know what the terms were.  I doubt you do, either, but I assume it slows --

MR. CLOUSER:  I think Ms. Bowman does, but I do not.

THE COURT:  Yeah, but I would strongly suspect, especially if there's a privilege with his wife and his wife's name is a privileged term -- then I guess this will slow things down.

So it does not seem like this was the way to come at it.

MR. WAX:  Your Honor, we're fine with the 33 named individuals' text message streams being produced and making the rest of the phone available for inspection because if we have -- we simply don't have time --

THE COURT:  I know.

MR. WAX:  -- to go through the entire phone, and a Cellebrite report is going to be hundreds of thousands of pages.

THE COURT:  I know.

So I understand, and your supervisors' authority, permission, whatever else it is, is between you and them.  Understand that I am requiring you to separate the contents that I am ordering you to produce.

If, in their infinite wisdom, the supervisors at the U.S. Attorney's Office -- I -- you know, I just don't -- I want to be clear that it's not what I am not trying to interfere with.  You-all have a trial strategy, and you are adhering to your rules.  I understand that.

Okay.  But what I don't want is for the whole phone to go over without the text messages being pulled apart in a manner that is reviewable to them.  So your decision or your supervisors' decision to produce the phone -- just please understand that it is separate and apart from your production of the text messages.

Do we understand?

**MR. CLOUSER:**  Sure.  Sure.

And just to clarify -- so my understanding -- and we will confirm this -- is that the -- the form in which the phone will be produced is in an Axiom Portable Case, not in Cellebrite.  For various technical reasons, Cellebrite wasn't able to handle the data.  And in Axiom, you can actually select the text strings.

So that's how we initially extracted the text strings with the defendants, is that the analyst was able to say, "All right.  This is the text strings with these phone numbers associated," and so --

**THE COURT:**  Please pause there for a split second.

**MR. CLOUSER:**  Yeah.

THE COURT: Have you-all had a chance to look at the texts that they have produced to you from Waxman's phone --

MR. WAX: I -- I have not.

THE COURT: -- with your clients?

MR. WAX: I have not yet, Your Honor.

THE COURT: Mr. Klugh?

MR. WAX: I can't speak for co-counsel, but I -- yeah.

THE COURT: I just want to see if it's in a format that you've been able to use, and let's get to the grit of whether it's working.

MR. KLUGH: I mean, I just took a look at it, and my password didn't even open it up, Your Honor. So I didn't get very far. Everything is password-protected, and sometimes the passwords work, and sometimes they don't.

THE COURT: So sometime very soon --

MR. WAX: Judge, what -- what I'm hearing from the investigator is that the previous disclosure of text messages is in PDF form, and there were --

THE COURT: Well, I'm not -- but there's been a lot, right.

MR. WAX: Right.

THE COURT: There's been more than -- this is the most recent production. What we're -- I don't think that we're going to get landing on this at this hearing.

So what I want you both to do, please, is to attempt to

open the data that is your own client's text string with Waxman so that you can determine whether or not there's any impediment to the file format.

Remember, time is at issue; right?  So if there's -- if you haven't received it in a matter that works, you have to convey that to the Government soon.

MR. WAX:  Judge, what I'm hearing from Mr. Clouser is that the text streams that are going to be produced in this Axiom format are going to be discrete as to each individual on the list of 33 people.  And then from there, it would even be searchable.

Is that --

MR. CLOUSER:  Yes.

So -- and it is in the same format that -- where the -- our original production of the texts between the defendants and Mr. Waxman is in that Axiom Portable Case.  We also produced them as a PDF so that we could Bates-stamp them for use at trial --

THE COURT:  Okay.

MR. CLOUSER:  -- but -- the original production.

So if you can access that and that meets your --

MR. WAX:  As long as it's searchable.

MR. CLOUSER:  Right.

THE COURT:  But you -- but as I understand it, no one has yet had a chance to check them.

MR. WAX: Yeah.

THE COURT: So I'm asking you to check -- I know that the investigator has seen the PDFs, but you're going to get 33 persons' text messages. If you are getting it in a very -- a PDF is not quite as manipulatable.

MR. WAX: It's not searchable in that -- in that --

THE COURT: It can be.

MR. WAX: It can be but not -- not in this way.

THE COURT: It should be, but this sounds like a format --

MR. CLOUSER: And it should be. The PDFs that we produced, I believe, are --

MR. WAX: They're OCR'ed?

MR. CLOUSER: -- OCR'ed. I believe so.

THE COURT: Oh. Everything -- right.

MR. CLOUSER: It should be.

THE COURT: We've covered that ground before, the OCR stuff. It's all OCR'ed --

MR. WAX: Praise God.

THE COURT: -- but -- but the -- but there still would be single documents as opposed to -- it sounds like what Mr. Clouser is describing -- you would be able to filter, essentially, by user and go -- would it -- it would -- it sounds like it would be a faster review.

MR. CLOUSER: Right.

**THE COURT:** So make sure that you can use it. And if you can't, or you have any trouble with it, you talk to Mr. Clouser so that he can either not produce it in that format or help you understand what you've got. It could also be a vendor problem -- right? -- if your platform isn't supporting Axiom or something along those lines, but you've got to know that.

Here's where we are, though. I understand that what you're looking for is -- it was two weeks from maybe Wednesday. The reason I wanted to save it for bringing -- you know, until we were together is my concern that the manner in which the filter team is going about it didn't make sense, and that has been corroborated here by this. So when we don't have Mr. Waxman or his counsel in the room, we're -- we're living with limited information.

Here's my point, though. There are three people you have identified for whom the filter team, Ms. Bowman, should be assessing whether the materials that are sought have a privilege and, if they don't, just send to you, based on, I hope, Ms. Bowman, a privilege that's been articulated; right?

Like, if you're looking at this as the filter team and making a decision about a presumptive privilege, are -- do you have more information? And, obviously, I don't want you -- this is like a privilege log, Ms. Bowman.

Okay. I don't want you to tell me what the information

is, but you have more information than just search terms, I hope.  Yes?  If we --

**MS. BOWMAN:**  Your Honor, the most -- I do want to make clear that the most expeditious way for us to -- to review this material was, instead of doing searches for those individuals -- was to just run those limited search terms on the phone and get the phone out the door.

That's -- that's why we took that approach as the initial track.  It wasn't to make this more complicated.  It was simply because that was the most expeditious way, was to provide the limited terms that Mr. Waxman gave us, run them across the phone, and then get everything out the door.

You know, that's why we're able to --

**THE COURT:**  Wait, but hold -- hold that thought, Ms. Bowman, because I'm trying to understand that.

If you run the terms across all -- 33 people with whom no privilege -- privileged relationship has been identified, and you hit terms, and you get -- when you say "everything else out the door," what is the "everything else"?  Because if you're capturing part of a text string, unlike other types of documents, they're not uniquely severable.

So what are you holding back, and what are you getting out the door?  Maybe it would be helpful if I understood your process better.

**MS. BOWMAN:**  I guess our process, which we identified

as the most expeditious way of handling this, in consult- -- in consultation with our supervisors, was to run the terms that Mr. Waxman provided.  He agreed that anything that hit on those terms would be identified as potentially protected and withheld from the prosecution team and the defendants.

And then anything that did not hit on those terms would be released, subject to -- if something was potentially privileged, it would be protected by the 502(d) provision and the clawback provisions of the discovery protocols.

THE COURT:  So the question that I'm -- I'm still not sure that I understand -- is when you say when it hits on something, in the context of a text string, does that hit not then hold back the entire text string with that person?

MS. BOWMAN:  It -- it could if it's with a particular attorney or -- or the wife.  But I -- we understand that if it has hit on something -- you know, maybe a particular message where that person -- that name was referenced, that -- that particular message would be withheld.

That's our --

THE COURT:  So, Ms. Bowman, have you -- have you actually -- have you -- have you done this analysis?  I don't know if I'm asking maybe the wrong person.

MS. BOWMAN:  So I have -- I have gone through the phone, and I have -- I have -- we've had a team do it, and then I did a review of it yesterday, and I'm finalizing it today.

And we are planning to provide -- save a copy of it to our drive and send the materials back to the analyst so he can produce one copy containing the potentially protected material to Mr. Waxman for review and one copy that does not contain the potentially protected material that did not hit on those terms to the defendants and the prosecution team.

It's --

THE COURT:  Okay.  Hold up.  Hold up.  Sorry.  I just wanted to -- again, that question was just to know if you had familiarity with it.

Back to my example with John Smith, if John Smith is not a name that Mr. Waxman identified as presumptively privileged, it -- "John Smith" is not a search term in my hypothetical.

If you were to run, say, the name "Lazarus" across everybody's data, and you had a hit for that word in John Smith's text message, do you hold back the entire text chain between Mr. Waxman and John Smith in order to assess for privilege?

MS. BOWMAN:  No.  Our understanding is that just the message that hit on that term would be withheld.

THE COURT:  But -- so they are severable in your platform?

MS. BOWMAN:  That's -- that's how we understand it, based on the information we've been provided.  However, if there was a communication solely with the attorney, then we

would withhold the entire communication.

THE COURT:  Right.  Right.

I'm putting those three in a narrow -- their own separate bucket for a second.

So, Ms. Bowman, did I understand you correctly to say that you have -- are in the process of finalizing and intend to send tomorrow to the prosecution and defense team what you said was the rest of the materials that you're not sending to Mr. Waxman?

MS. BOWMAN:  We were not able to send it directly to the defendants.  We have to send it back to the analyst to create a -- a portable case.

THE COURT:  Sure.

Sorry.  My mistake, but -- okay.  But you're getting ready tomorrow to release information to the analyst, and that's intended for production; is that right?

MS. BOWMAN:  So he will process it and create two portable cases.

He will create one portable case that can go to the defendants and the prosecution team, and that will withhold the material that we've identified, based on the search terms Mr. Waxman gave us as potentially protected.  So it will be a redacted phone.

The other phone he will create will be based on the -- on the search terms, and that will be the potentially protected

version, and that will go to Mr. Waxman.

THE COURT: Okay. So talking just about the package that you are sending to the analyst that's intended to go to the prosecution team, can you describe it for me at all?

Do you know how many persons -- I keep calling them "custodians," even though that's imprecise, but can you describe for me how many text strings there are in there or what the volume is? Can you describe that amount of data to me at all?

Is it a significant amount of text messages? Is it two people?

MS. BOWMAN: It is -- I mean, it is a very large phone. I can tell you there's over, you know, 200- -- I think 230,000, approximately, emails on the phone.

I think, in the sense of --

THE COURT: Wait, wait, wait.

But do your -- but do you hear me, Ms. Bowman, when I say that you're not -- you're not getting ready to inundate the analyst with the entire phone? We're talking about sending to the analyst the balance of the 33 non-privileged custodians for production; right?

MS. BOWMAN: So that -- that's going to require -- that is requiring additional time. We have reviewed -- currently viewing that as well, but we are able to produce the entire phone, we think, sooner than -- than accessing those

individual messages.

However, we will have a team that will continue on that process.

THE COURT: Why? Why is it so difficult to -- especially in the manner that Mr. Clouser has -- has described the platform, why is it time-consuming to extract these 33 custodians -- I'm going to just keep calling them that, and we understand what it means -- from the file that Ms. Bowman is sending to the analyst?

The analyst is in the position of having to process and produce that entire ginormous phone as opposed to the relevant subset of requested messages. It's both expensive and time-consuming.

I don't -- I -- does anyone understand why it would be more efficient to produce the entire phone than the 33 who have been requested, the mechanics of it? Does anyone understand?

MS. BOWMAN: I think what we could do is we can talk to the analyst, and we can provide him with the relevancy communications -- or relevant communications that we've identified thus far involving those parties, and he can potentially create a version that withholds any material.

He can, like, basically zip up -- zip the two together and create -- pull out those communications and then pull out any -- any hits that hit on the privileged terms that Mr. Waxman has identified.

I think -- I think that's possible, but I do want to confirm with him before I make a statement to the Court that that's a hundred percent accurate.

THE COURT:  Okay.  Is there anyone who --

MS. BOWMAN:  I want to make clear to the Court that we don't have -- based on -- we're working off this -- I'm going to call it an Axiom Portable Case.  We don't have the technology in our current possession, as the filter team, to create another portable case.  We have to send it back to the analyst to send it out.

That said, we do have the capability of potentially creating a PDF version or an HTML version of the material that the defendants are seeking.  However, the analyst has advised us, because -- depending on the size of those communications, it may or may not work because the phone is so large.

So we -- the size of that --

THE COURT:  Okay.  Ms. Bowman, I'm going to do this -- Ms. Bowman, I'm going to interrupt you.  I apologize --

MS. BOWMAN:  Yes.

THE COURT:  -- but I'm doing so, in part, because there's -- there's enough of what you're explaining to me that I don't understand because I don't have the predicate for the technology you're describing when you tell me you don't have the tools for certain things.

What I'm going to do is ask:  Is there anyone who can't be

back with me, even if we don't do it in person, on Tuesday? Because we -- we have got to have answers to this.

MR. WAX:  I'll be in trial, Judge.

THE COURT:  Mr. Wax, you've always got something going on.

MR. WAX:  I wish I were not in trial, but it's --

THE COURT:  He --

MR. WAX:  I'll be in front of Judge Gayles.  I mean, I can allow co-counsel to stand in for me.

THE COURT:  That's exactly what I was about to ask.

MR. WAX:  Not a problem.

THE COURT:  We have to get landing on this.

MR. WAX:  Let him stand -- I trust him.

THE COURT:  There's three of them.

We're good?

MR. WAX:  Right.

Yeah, and between all three of them, they make up six.

THE COURT:  Right.

MR. WAX:  So we're good.

THE COURT:  Thank you, Mr. Wax.  I appreciate it.

If there is anything that I think is unique to your client, we'll hold it until I can -- even if it's just scheduling a telephonic conference, we'll take it up when we have you.

But by Tuesday, we have to at least understand the

rationale for slowing this to, what sounds like, produce the entire phone as opposed to extracting the very narrow pieces, again, just the origin. I think you were with me that day, but the origin of this was, "We're handing over the text messages. We want them all."

"Okay. We'll get you them all." But now we've got the whole phone, and I just -- we have to rein it in. I understand your concerns -- they are well-placed -- with respect to making sure that the phone is made available, and should the defense want to inspect it, they have that opportunity.

But I want these -- these text strings -- it was agreed. That's how we agreed to do it. I don't want to backtrack from where we agreed to be. If there is some technological reason why it cannot be done in that way, please just be prepared, someone from your team, even if the analyst has to be here.

You know, I don't know the Axiom platform. So, you know, if there's something that is specific that inhibits that -- but the other piece of it, too, Ms. Bowman, for your purposes -- I really need to have an understanding of how much more work the filter team has and why.

Okay. So you understand that the agreements in this case permit Waxman a period of time to review, to send -- to release, to hold back. And I understand that everybody operates here with the greatest familiarity of their own client's position and privileges and why it was set up that way

and hopefully get us working, but we don't have a lot of time built in here for challenges.

So I want to make sure that the work is being done on the front end, is informed, and would stand up to any type of scrutiny or on the back end if it were asserted. Again, Ms. Bowman, I'm kind going to that tantamount to a privilege log.

Like, there was a -- as you're looking through these things, it would -- anyone doing a privilege review would need to know what the basis of the asserted privilege is as opposed to just the terms. And so I just don't have a good handle on whether or not the way that it's being done is as quick as it can.

Most of this might be moot by the fact that Ms. Bowman has just said that she's going to be in a position to send a very large amount of data to the analyst, which hopefully will be a substantial amount of the presumptively not-privileged text messages.

I don't have a handle that that's the representation that Ms. -- Ms. Bowman is making about what the data is, but we will by Tuesday. Okay? That's the goal for Tuesday. We will know what's been done, what needs to be done, so that I can evaluate your motion for extension of time.

Fair?

        **MR. CLOUSER:** Thank you, Your Honor.

THE COURT:  Do you have any questions, though, about what the task is between now and Tuesday?

MR. CLOUSER:  I --

THE COURT:  And I meant it when I said is there anyone who can't be back on Tuesday, even if we have to do it in a means other than in person.

MR. CLOUSER:  I believe I can be here in person.  I know my co-counsel will not be able to, but --

THE COURT:  Okay.

MR. CLOUSER:  -- I should be able to be here in person, and I believe I understand the Court's ask.

THE COURT:  Okay.

MR. CLOUSER:  One question is -- so my understanding from Ms. Bowman is that the -- the production of the broader phone is actually more -- quicker.

THE COURT:  I've heard her say it.  I didn't understand --

MR. CLOUSER:  Sure.

THE COURT:  -- why.  That's really why I want to hear everybody on Tuesday.

MR. CLOUSER:  And so we'll address why that's the case on Tuesday as well.

THE COURT:  Unless, under close scrutiny, and hearing that the 33 -- the custodial data --

MR. CLOUSER:  Uh-huh.

THE COURT:  -- should be produced in a manner that is not subsumed in the entire phone.

MR. CLOUSER:  Uh-huh.

THE COURT:  The analyst and/or team may have a new perspective on that.

MR. CLOUSER:  Okay.

THE COURT:  And if they don't, I just need to understand it.

MR. CLOUSER:  Yep.

We'll be in a position to do so.

THE COURT:  Mr. Quintero?

MR. QUINTERO:  Your Honor, if I may, a couple things.

We don't have a problem with Tuesday except that we have a case before Judge Williams that is set for a three-hour hearing toward the end of the week.  We have a joint defense counsel meeting Tuesday morning, starting at 9:00.

I can make -- I mean, Mr. Quinon and I can make ourselves --

THE COURT:  How's the afternoon?

MR. QUINTERO:  -- available in the afternoon anytime.

THE COURT:  Okay.

MR. QUINTERO:  And that will be fine.  That's one point.

The other point is --

THE COURT:  Would you like 1:30?

MR. QUINTERO:  Whatever time you --

MR. QUINON:  That's fine.  That's fine.

MR. QUINTERO:  Any time in the afternoon is fine.

THE COURT:  1:30 it is.

MR. QUINTERO:  Your Honor, the -- the other point is that -- and we'll know more on Tuesday, but if -- if, at a minimum, we cannot get those text messages and emails from those 33 individuals, and the technician has to give us the whole phone in a Cellebrite or an Axiom report, it's game over. There is no possible way --

THE COURT:  I hear you, Mr. Quintero.

We're going to wait and see.  That's why we're going to do it in such quick measure.  And the homework assignment for the defense counsel, then, also means, before we come in on Tuesday -- you've -- you've attempted to open not the PDFs --

MR. QUINTERO:  Yeah.

THE COURT:  -- but the plat- -- the Axiom platform. And to the extent you identify any problems -- I think Mr. Klugh said that his password didn't work -- you've communicated that to --

MR. QUINTERO:  Sure.

THE COURT:  -- to Government counsel and attempted to open it.

I know you have a meeting at 9:00.  I'm going to let you go now.  It's 12:30.  So hopefully, in between the two, there's

a minute just to see that you can view and search the data in the manner --

MR. QUINTERO:  Yeah.

THE COURT:  -- that the Government's produced it.

MR. QUINTERO:  I -- and I can tell the Court that, in the short period of time that we've been -- Mr. Quinon and I have been in the case -- which -- we're obviously way behind the eight ball and catching up to discovery.

The Government's been -- bent over backwards to -- to help us.  They've provided us access to the USAfx site.  They've put in -- files in there.  Obviously, they're massive files.

THE COURT:  Right.

MR. QUINTERO:  We're trying to get to everything as quickly as we can, but I just wanted to tell the Court they've been -- they've been cooperating with us in that regard, and we've been cooperating with them and working things out.

So I don't think that's going to be an issue.

THE COURT:  It hasn't been.

MR. QUINTERO:  Yeah.

THE COURT:  I appreciate it, but it does seem like everyone has a high interest in just figuring out the mechanics of the discovery, and I appreciate it.

So to that end, if you open it and you can't work it, Mr. Clouser probably can.  So --

MR. CLOUSER:  One clarification question.

So I just heard defense counsel indicate that they are also expecting emails between all of the -- is that -- for lack of a better word, custodians.

Is that correct, that you want all communications on the phone?  Emails?  Text messages?

**MR. QUINTERO:**  Yeah.  Yeah.  That's what the purpose was, yes.

So --

**MR. CLOUSER:**  Okay.

**THE COURT:**  Okay.  So hold up because I want to, again, orient everybody.  This started with Mr. Seitles's demand for the text messages.

Okay.  And I have asked -- I have insisted that we prioritize, because of how they -- how they can be extracted, the text messages.  I did not even know what the email function -- well, let me be clear that I assume there are all kinds of other forms of discovery, and I know that there's been computers and other phones.

So while I understand that emails are no surprises -- in fact, I've had proffers about emails between Waxman and -- and Alexander that have previously been produced.  The -- so I know that there's a basis for the defense to already have identified, or be able to identify, specific email accounts or even date ranges.  Email is going to be a much bigger repository than text messages.

So, again, this kind of falls into the "Let's be mindful of what you're asking for" to the extent that you're seeking a ton of new data that may be entirely duplicative of that which has already been produced and isolated.  And so for purposes of my Tuesday hearing, on text and WhatsApp messages --

**MR. CLOUSER:**  Okay.  Thank you.

**THE COURT:**  -- I would like -- sorry.

I would like you both to confer before Tuesday, if possible, about what emails it is that you think should be on that phone, based on what has been produced and identified at other prior hearings for them to go to.  These -- it may already be -- and I heard Ms. Bowman make a representation about emails.  It may have already been filtered.

So -- so -- so ask before we come in on Tuesday before we just say, "Yes, emails, too."

**MR. CLOUSER:**  And as part of that conferral, the email addresses aren't -- don't always correlate with the names of the individuals.  And so if there are particular email addresses that are associated --

**THE COURT:**  That's precisely --

**MR. CLOUSER:**  -- we'll need to know them.

**THE COURT:**  That's precisely my concern, Mr. Clouser, in a number of ways.  Email and text message -- the text messages travel with a telephone number; right?  And email accounts can be numerous.

So I want to -- this is not intended -- well, let me state it this way.  There may or may not already be vast productions of email between various individuals.

MR. CLOUSER:  Uh-huh.

THE COURT:  If memory serves, there's an index of discovery in this case, is there not?

I want to say that at least the filters -- I'm sorry.  The folders are situated by individuals and with correspondence and so forth.

MR. CLOUSER:  Uh-huh.

THE COURT:  So there should be some ability, before you try to get it from Waxman's phone, to assess the overlap.

MR. QUINTERO:  Let me -- let me clear up my statement.

Remember that we're going by what the Court is saying.  Whatever it was that Mr. Seitles and the Court agreed upon, we're going to stick with that.

THE COURT:  Okay.

MR. QUINTERO:  I -- I may have misunderstood.

THE COURT:  No.  Ms. Bowman had said "emails."

MR. QUINTERO:  I may have used the term "emails" --

THE COURT:  I hear you.

MR. QUINTERO:  -- because I'm -- I was assuming that the term "communications" -- okay? -- included both text messages and emails.

But if the understanding that was presented to this Court

and to the Government was only the text messages, let's stick with that.  Let's work with that.  As long as they have the phone available for inspection later --

THE COURT:  Right.

MR. QUINTERO:  -- we can always come back before the Court, if we have time.  But for now, let's just stick with what was presented to Your Honor and what Your Honor ordered to be produced.

MR. CLOUSER:  All right.  That's fine.

THE COURT:  Thank you, Mr. Quintero.  I appreciate it.  I agree.

Okay.  Fair enough?

See you Tuesday afternoon, 1:30.

Mr. Klugh?

MR. KLUGH:  Your Honor, one matter that Mr. Quinon, I think, is going to address.

We have a deadline today on discovery, and Mr. Seitles's team has produced, again, the expert reports and expert summaries of all of that and has, as well, produced -- I can't remember.  There was one other thing produced.

Beyond that, I believe that anything that we'd have any intention of using in the case-in-chief at this point in time is contained in the Government's discovery already that's been produced.  So we don't have it actually in our control.

But I think that, in any event --

**MR. QUINON:**  Yeah.

**MR. KLUGH:**  -- Mr. Quinon needs additional time because -- to establish -- I mean, having us come into the case, to establish what's going to be introduced in the case-in-chief is going to be very difficult in this time frame.

**MR. QUINON:**  Judge, I understand we're very close in time.  We're very constrained because of the time.  I have already started with the Government.  We had some documents that were not given to us that I felt likely we are going to use.  I've already put them in a drive, and I gave it to the prosecution team this morning.

We're going to work with the prosecution team as expeditiously as we can to share whatever documentation we think we are going to be introducing, or attempting to introduce, at trial.

So -- but I cannot obviously meet a deadline today because we have not -- even today, as I speak to you, we don't have access yet to the file that Mr. Seitles has.  We're going to pick it up today.

So I'll work as expeditiously as we can, but, you know, we can't meet a deadline today, obviously.  I think that's --

**THE COURT:**  I mean, tell me if I'm wrong.  I'm sort of hearing an ore tenus motion for an extension of time.

**MR. QUINON:**  Yes --

**THE COURT:**  Okay.

MR. QUINON:  -- but that is such an elastic -- I didn't want -- I didn't want to put it that way because then I would -- you would say, "Okay.  When?"  And I was afraid of that question.

THE COURT:  You knew exactly --

(Laughter.)

THE COURT:  No.  Actually, first, I was going to ask if you conferred with the Government, and then I was going to ask you when, but you were close.

So is that a -- this is -- Mr. Clouser, you have not heard this one before.  So --

MR. CLOUSER:  This -- this morning, we --

THE COURT:  Oh.

MR. CLOUSER:  -- received a drive and were told that there were potentially additional documents that were not yet produced, yeah.

THE COURT:  Okay.  So both sides are seeking more time to -- and as I understand it, this is -- this relates to the standing discovery order, Rule 16.

MR. QUINON:  Yeah.  Yeah.  Yeah.

THE COURT:  Mr. Klugh is nodding.

MR. QUINON:  Right.

THE COURT:  So there has been a production, but it is the -- on behalf of Mr. Alexander, you don't view it as complete.

Tell me if that is because you can't functionally certify that it's complete because you haven't looked at it yourself or because you know there are additional materials that you will be searching for and producing from.

MR. QUINON:  Insofar as -- given the Rule 16 discovery?

THE COURT:  Yes, sir.

MR. QUINON:  Well, the fact that we have not yet had access to the documents that we need to look at in order to make that determination -- we don't have physical access to the file of the case yet.

THE COURT:  No.  No.  I understood that.

So this so rarely comes up in criminal cases that I only have the civil analogue, but it's -- it's the functional difference of, like -- do you know that there are documents you're producing?  You just haven't got to them yet, or you just don't know what you don't know?

MR. QUINON:  Oh, no.  There are going to be documents that we're producing, and that's why I started already the ones that came to my attention that I thought we would be producing. I already produced them to the Government this morning, and as I come across them, I will produce them in a -- as timely as I can.

I -- in fact, from this point forward, most of the documents that we're going to be utilizing are -- are documents

that we received from the Government.

THE COURT:  That --

MR. QUINON:  What I did -- what I did -- the first thing that I wanted to do is get to them documents that they did not give to us because I know that those would be the ones that the -- would -- would be of most interest to the Government.

And so I -- I identified those, I put them in a drive, and I said, "Listen, these documents we did not receive in discovery from the Government, and we are intending to, or planning to, possibly introduce them.  So here are copies of those documents."

THE COURT:  May I make a very practical, I hope, suggestion?

MR. QUINON:  Sure, Judge.

THE COURT:  I'm going to see you again on -- on Tuesday.  Yeah?

MR. QUINON:  Right.

THE COURT:  My suggestion is if you're going to get those materials today -- I don't think that, as you stand here, you stand in a position to know what extension you are seeking.  So -- if I understood you right.

MR. QUINON:  Not at all.

THE COURT:  But by Tuesday, you should be.  And by Tuesday, you should also maybe have conferred with the

Government about what the ask is.

I would put out there that I am warned that a motion for extension of time is coming and that you are not yet in a position to make it. But if you do so before Tuesday, we will take it up at 1:30.

And I'll know the Government's position, and I'll know what amount of time you are seeking, and I'll be able to make a better-informed, educated decision then.

**MR. QUINON:** Yeah, that's fine, Judge. Yeah, I can live with that. I mean, I -- we're going to work over the weekend, obviously, trying to --

**THE COURT:** Well, I heard one of you say it was a holiday on Monday. I was like --

**MR. QUINON:** Right.

It's not. We don't have a holiday from now --

**THE COURT:** -- "Which one of us" --

**MR. QUINON:** -- until this case has ended anyways. We're going to be working as fast and as --

**THE COURT:** Right.

**MR. QUINON:** -- as vigorously as we can.

So, yes, I -- we will try to make an assessment and see what kind of an extension we're going to need, and I'll have that hopefully by Tuesday. I'll -- I'll be able to communicate that --

**THE COURT:** Is that reasonable, Mr. Clouser?

MR. QUINON:  -- yeah.

MR. CLOUSER:  Yes, Your Honor.

THE COURT:  You've got something from them to keep you busy between now and then?

(Laughter.)

THE COURT:  Okay.  Okay.  Then tell me if there's anything else that we haven't taken up that's ready to be taken up.

I didn't mean to make this a --

MR. CLOUSER:  Nothing from the Government, Your Honor.

THE COURT:  Thank you, Mr. Clouser.

I didn't mean to make this an endurance test, but here we all are, three hours and 15 minutes into it.  Congratulations to those that made it to the bitter end.

I'll see you 1:30 on Tuesday.  We'll get you reports and recommendations and/or orders out as fast as we can on your substantive motions, and I'll see you at 1:30.

MR. WAX:  Have a great weekend, Judge.

MR. CLOUSER:  Thank you, Your Honor.

THE COURT:  You're welcome.

MS. DE BOER:  Thank you, Your Honor.

MR. QUINTERO:  Thank you for your time, Your Honor.

THE COURT:  Thanks.

MR. WAX:  Hey, Judge, when did you finally get a table the other night?  How late was it?

THE COURT:  Oh, it was quick.

MR. WAX:  Good.

(Proceedings adjourned at 12:48 p.m.)

**CERTIFICATE OF TRANSCRIBER**

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Southern District of Florida, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Thursday, October 3, 2024


/S/ James C. Pence-Aviles
_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter